### UNITED STATES v. NEWHOFF et al.
### No. 260.

Circuit Court of Appeals, Second Circuit.
June 8, 1936.

Fred D. Kaplan, of New York City, for defendant-appellant Samuel Newhoff.

Leo J. Hickey, U. S. Atty., and Vine H. Smith, James G. Scileppi, and Frank J. Parker, Asst. U. S. Attys., all of Brooklyn, N. Y.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The appellant Newhoff was indicted for conspiring with defendant Neuwirth and others to violate section 415 of title 18 of the United States Code, 18 U.S.C.A. § 415 [National Stolen Property Act, § 3] and also for violating that section. The first offense was set forth in count 1 of the indictment, the second in count 3, and Newhoff was convicted on each count. Neuwirth was also convicted upon the same counts but has taken no appeal.

Section 415 provides as follows: "Whoever shall transport or cause to be transported in interstate or foreign commerce any goods, wares, or merchandise, securities, or money, of the value of $5,000 or more theretofore stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen or taken, shall be punished by a fine of not more than $10,000 or by imprisonment for not more than ten years, or both." 48 Stat. 794.

The first count of the indictment charged that the defendants Newhoff and Neuwirth conspired to receive, sell, and dispose of bonds of the value of upwards of $5,000 which had been stolen while moving in interstate commerce. The overt acts alleged were: (1) Receiving and selling seven Min-nesota Land Bank bonds and six Indiana Land Bank bonds, identified by numbers, which were moving in interstate commerce; (2) the assumption by Neuwirth of the fictitious name of "Harry West"; (3) the opening by defendants of a trading account in the name of "Harry West" with Whitehouse & Co., a brokerage house; (4) the deposit of the bonds with the brokers for sale; (5) the purchase of United States Steel Company stock from the proceeds of sale of the bonds; (6) the sale of the steel stock; (7 and 8) the receipt and retention by the defendants of the amount due from Whitehouse & Co. on the "Harry West" account paid by two checks drawn by Whitehouse & Co. to the order of "Harry West" and cashed by Neuwirth at the National City Bank, Nassau Branch, in the Borough of Brooklyn.

The third count of the indictment charged that the defendants on or about October 11, 1934, caused the stolen securities to be transported from Chicago to New York knowing them to have been stolen.

There was ample proof that the bonds were stolen in Chicago. On October 11, 1934, a messenger boy, named Reder, who was employed by the Chicago brokerage house of Robinson & Co., was given the bonds for delivery to the American National Bank of that city. He testified that he did deliver them into the cashier's cage at the bank, but the cashier denied having received them. The seven Minnesota bonds were to be forwarded by the bank to a customer at Rockford, Ill., and the six Indiana bonds to a customer in San Francisco. The bonds disappeared either en route to the American National Bank or at the bank. The loss was not discovered by the bank until the evening of October 11, 1934, the day when they were to have been delivered. So far as the evidence in this case discloses, they next turned up in Brooklyn on October 16, five days after their disappearance in Chicago, when Neuwirth placed them for sale in the "Harry West" account with Whitehouse & Co. and sold them for $7,792.75. He had opened this account with the brokers in the fictitious name of "Harry West" on October 11, the very day when the Chicago bonds were stolen in that city, and had left with the brokers on that day certain Home Owners bonds of the face value of $6,325 which had been stolen from a bank in Westchester county on October 10. There was proof of the sale of the Westchester bonds by the brokers on the day on which they were re-

ceived. The "Harry West" account was finally closed on October 22, 1934, through Neuwirth's withdrawal by checks drawn to the order of "Harry West" of the balance remaining to the credit of the latter. He cashed the checks at the National City Bank in Brooklyn.

Neuwirth never appealed from the judgment of conviction under counts 1 and 3, and the record establishes his guilt beyond any question. It is, however, contended on behalf of Newhoff that the evidence in no way connected him with conspiring to receive or to sell the stolen bonds or with causing them to be transported in interstate commerce knowing them to be stolen, or with conspiring to do this. But we are satisfied that there was evidence which justified the jury in finding that Newhoff was connected with the criminal transactions. Newhoff's connection with the transactions is shown by the testimony of Dickman, who had introduced Neuwirth to Whitehouse & Co. under the fictitious name of "Harry West" on October 11, 1934, when the account was opened under that name. Dickman became suspicious of the doings of Neuwirth because of the low prices at which the latter was selling bonds. He was informed by Neuwirth that he was opening the account with Whitehouse & Co. in order to dispose of bonds for Newhoff. Accordingly, Dickman had a conversation with Newhoff at Neuwirth's house, at which Dickman said to Newhoff: " 'Listen, are these bonds good?' And he said, 'Certainly they are good. Do you think I would give my friend Sam here bonds that will get him in trouble? Why, I know him since we were little boys together, and I would never do anything like that.' "

In addition to the foregoing, there was a conversation between Newhoff and Neuwirth on November 14, 1934, which was overheard by a government detective named Malone who had installed a dictaphone in a room which Newhoff was to enter in order to be confronted by Neuwirth. On that occasion Newhoff asked Neuwirth if the latter had told the government agents that Newhoff had given him the bonds, and Neuwirth replied: "Yes, I told them." Record pp. 148 and 149. Upon this statement Newhoff left the room, slamming the door. Whereupon Turrou, another government agent, said to him: " 'Did you see Neuwirth?' He said, 'Yes, I saw him.' I said, 'Did he tell you what he told me?' And he said, 'Well, I didn't want to talk.' I

said, 'Did he tell you the same thing that he told me, that he actually got these bonds from you?' He said, 'I do not want to make any more statements without consulting my lawyer about it.' " While Turrou testified that Newhoff had denied that he had anything to do with the bonds, the testimony of Dickman and Malone tended to show that they were actually possessed by Newhoff.

It is contended also that there was no proof that the bonds referred to by Newhoff, when he told Dickman that the bonds he had given to Neuwirth were "good," were the bonds involved in this case. It is true that the bonds which Dickman asked Newhoff about were not specified in the question, but when we remember that the bonds in the "Harry West" account were stolen and that the discussion was about bonds that Dickman had heard were selling at suspiciously low prices, it is most unreasonable to suppose that the conversation referred to bonds other than those in the "Harry West" account. Only the bonds in that account were thought of by Dickman.

In our opinion there was proof that Newhoff caused stolen bonds to be brought from Chicago and that he delivered them to Neuwirth in New York within five days after they were taken from the owner in Chicago. Neuwirth opened the account under the fictitious name of "Harry West" on the very day when the bonds were stolen in Chicago and five days later deposited the bonds that had disappeared in Chicago in that account. These facts and the conversations between Dickman and Newhoff, Newhoff and Neuwirth, and Newhoff and Turrou, and the sale of the stolen bonds on the order of Neuwirth and the appropriation of the proceeds of the "Harry West" account by cashing the checks on Whitehouse & Co., indicate co-operation and tend to show that Newhoff and Neuwirth were both guilty under the counts on which they were convicted. United States v. Di Carlo (C.C.A.) 64 F.(2d) 15; Drew v. United States (C.C.A.) 27 F.(2d) 715.

There was no error in admitting declarations of Neuwirth made to the government agents after the conspiracy had ended. They were competent proof against him, and the jury was warned they were not received against Newhoff. It would have been impossible to try the case properly without admitting them under the above conditions. A severance is not required in

order to justify the admission of the declarations of a codefendant, when the jury is instructed as to just how far the declarations are competent evidence.

Judgment affirmed.