404 P.2d 397

**STATE of Arizona, Appellee,**

**v.**

**Ronald Clifton Joseph GOODYEAR, aka Donald Clifton Joseph Goodyear, and Steven David Jackson, Appellants.**

**No. 1277.**

Supreme Court of Arizona.

En Banc.

July 19, 1965.

Darrell F. Smith, Atty. Gen., Robert W. Pickrell, former Atty. Gen., Philip M. Haggerty, Asst. Atty. Gen., for appellee.

James F. Haythornewhite, Nogales, for appellant Goodyear.

George W. Oglesby, Nogales, for appellant Jackson.

McFARLAND, Justice:

Appellants, Ronald Clifton Joseph Goodyear also know as Donald Clifton Goodyear and Steven David Jackson, hereinafter designated as defendants or Goodyear and Jackson, were tried jointly for the crime of robbery and murder. Both were found guilty by a jury which fixed the punishment at death. From the conviction and sentence of the court they appeal.

Goodyear was born in Clifton, Arizona, in 1918, where he lived with his grandmother until he was seven or eight years old. After his mother's death—when he was about five years of age—he lived with various relatives, part of the time with an uncle and aunt in Europe. After returning to the United States he lived for four years in Michigan with a grandmother and two spinster aunts. He attended school until the tenth grade. After a year in the Civilian Conservation Corps, he enlisted in the United States Navy in 1939, where he served until 1945. He married in 1940, while in the service, and remained married for a year or two after discharge. There were two children from this marriage. He worked in various places—mostly in the East as a cook and baker. In 1950 he was recalled to the service, and stayed until 1955. After his discharge he worked at various cooking and bakery jobs in California, New York, and Arizona. The evidence showed he had homosexual tendencies. In January 1960 he was sent to the California State Hospital at Atascadero, California, as a sexual deviate. It was here that he met Jackson, who was also an inmate. Jackson had not been proven a sexual deviate, but had exhibited definite signs to his parents and authorities of being mentally unbalanced. While at Atascadero Goodyear and Jackson became good friends.

Jackson's father testified that defendant Jackson, while a child, was not like other children when he first entered kindergarten at the age of five. He got so that he couldn't

talk for a while. He had to be taken to a speech specialist, and also to a child psychologist. At home he would lock the doors of the house, locking himself in the bathroom. Other children where they lived "poked fun at him," and for this reason they moved to another locality. After giving him speech lessons they put him in school again when he was seven years of age. While in school he would never play with other children—would never associate with any one. There developed a resentment between Jackson and his sister. When he started high school at thirteen or fourteen years of age, he began to have problems, and would stay out of school without the knowledge of his parents. He started to threaten his sister, and would beat her. The parents tried sending him to a parochial school. After problems there, he was taken to a psychiatrist, who advised them to take him out of the parochial school and put him back in public school. He continued to have problems and would miss school. He ran away from home twice—had trouble with his teachers, and offered to fight them, and they finally expelled him from school, at which time he began to run around with a rough bunch of boys. His father went to the juvenile probation office, and it was agreed to arrest him for stealing his father's car the next time he did in order to send him away to school.

He was sent to the Preston Trade School for Boys, and after his return began to have trouble again. He had a violent temper, and would walk in a circle around the trees where they lived, shouting and screaming and beating at the trees, making out as though he were beating his mother. There were days when he would not say a word to any of the family—would cook his own meals. When he was seventeen he went into the Navy, but was only there thirty-four days when they sent him back home. After he returned from Preston he developed a resentment toward his parents. He had a shotgun. He sawed the barrels off, and carried it around with him in the car, saying there was a gang after him, and he was carrying it to protect himself. His father stated that it was only in his imagination. He was placed in jail for four months where he was involved in a riot. He threw such a tantrum that they committed him to the State Hospital at Atascadero. He remained there about a year and a half. After his return he became calmer. Defendants, while at Atascadero, had made plans to come to Arizona upon their release, and prospect. Goodyear, after his discharge, wrote Jackson's parents wanting him to come to Arizona to prospect with him. Jackson thereafter joined Goodyear in Tucson. Upon being re-united, they obtained enough camping equipment to live out of doors in an area in Blue Haven near Patagonia, Arizona. Shortly after arriving there, they met the deceased, Maurice "Shorty" Powell, a retired railroad

pensioner, who was camping in that area. A short time later the three of them decided to move to another area to an abandoned house in the "Mowry Mine area." The three lived there together, largely upon the contributions of Goodyear and Powell. Goodyear received a Navy disability compensation, and Powell a railroad pension.

On October 5, 1961, they went to Tucson in an old truck owned by Powell, and spent most of the day shopping and doing errands. They left Tucson about dark for Patagonia —a distance of approximately seventy-five miles. Upon their return, Goodyear prepared supper, and all three had several drinks furnished by deceased, Powell, and proceeded to become intoxicated. Later, after dinner, they had more drinks. While Goodyear was washing dishes, about one o'clock in the morning, he heard some shots. Jackson staggered into the house, and said: "It's done. I'm glad." Then he broke into hysterics. Goodyear attempted to sober him by giving him coffee. In the meantime Goodyear went outside and saw Powell had been shot. While Goodyear was still in the house, Jackson went back outside and returned with a paper bag, in which he had placed the severed hands of the deceased. They did not report the incident to the sheriff's office, but disposed of the body by taking it to the "World's Fair area," which is along the Flux Canyon Road, placing it on a board and dumping it along the side of the road.

Before disposing of the body Jackson took Powell's wallet, keeping ten dollars for himself and giving the remainder (about eighty dollars) to Goodyear. That morning, after disposal of the body, they drove Powell's truck to Tucson, where they purchased a camping stove and supplies for the camp. While in Tucson, they visited some people Goodyear knew. Then, they returned to Patagonia. On the following day, October 7th, at one p. m., while Goodyear was in the Patagonia post office, Joseph Hill, deputy sheriff of Santa Cruz County, approached the truck, and proceeded to talk with Jackson. When Goodyear returned, the deputy asked both of them concerning the whereabouts of the deceased. They told him that Powell had gone back East on a trip—that he had a railroad pass. Hill stated that he told them he had a complaint out of Tucson about the vehicle. Shortly afterwards Milo Rendon and John Gammons, deputy sheriffs from Pima County, arrived. Hill read a complaint which had been brought by the deputies from Tucson. The police then asked for permission to search the truck. Hill testified that defendants said: " * * we could look at anything," after which the deputies searched the vehicle. On searching the truck they found two pistols, one belonging to Jackson and one belonging to Goodyear, two types of hunting knives— one belonging to Jackson—and a bayonet. The deputy told defendants he was placing them under arrest for concealed weapons,

and told Jackson he was under arrest for driving without an operator's license. The authorities then asked defendants if they would go with them to Mowry Mine. The truck was left in Patagonia, and Goodyear and Jackson accompanied the deputies to Mowry Mine. Hill testified in detail to the conversation which occurred with defendants, most of which was with Goodyear. The defendants made an explanation in regard to the crutches that were found, stating that Powell had taken another pair with him, and went more in detail as to how they had taken Powell to Tucson where he took a train East.

At six p. m., October 7th, the deputies brought both defendants before Judge Rothrock at Nogales for carrying concealed weapons. Between the 7th and the 10th of October, there were numerous conversations between defendants and the authorities—particularly with Goodyear—in which practically the same story was related as to Powell's whereabouts.

On the 10th day of October, 1961, Goodyear made a confession which was later signed by him. In the confession he admitted that he and Jackson had talked about doing away with Powell, and had agreed to wait until after Powell had received his check. Goodyear stated that they had talked about it four to six times. He then related the incidents of the killing of Powell, the cutting off of his hands by Jackson, and how thereafter they burned the hands and did away with the body. After making the confession, he then took the sheriff and other witnesses to the scene of the killing.

On the following day—the 11th—the officers told Jackson that Powell's body had been found and asked him about making a statement. He stated that he wanted to talk to Goodyear first, and was given this opportunity. Hill testified that Jackson asked Goodyear if he had told about Powell. Goodyear stated yes, and Jackson asked him if he should give a statement. Goodyear told Jackson he couldn't tell him to give a statement but that he had, and he felt better, that it was up to Jackson to do what he wanted. Jackson told the sherriff he would give a statement regarding the facts on Powell.

Jackson thereafter made a confession, largely substantiating that of Goodyear. He related how friction had developed among the three of them, and that the two defendants had talked about doing away with Powell on eight or nine occasions; that they had agreed to do away with him; that Goodyear had told him to get rid of Powell; that robbery was one of the motives for the killing; and that he had cut off Powell's hands, removed his wallet, took ten dollars out of it and gave the rest of the money to Goodyear; also how they had taken Powell's truck.

During the trial both Goodyear and Jackson testified in their own behalf. Goodyear's

defense was that he had not conspired with Jackson in regard to killing—that the conversations were merely to the effect that they had talked about this, and his saying "yes" was merely acknowledgment that he was listening to the conversation. He explained the conversation in regard to "getting rid of Powell" by stating that he expected Powell would leave, and that was the way they would get rid of him. Jackson gave notice of his defense by reason of insanity.

Jackson's counsel stipulated that Jackson shot Powell. Jackson called a psychiatrist from Tucson, Dr. Robert I. Cutts, who had examined him, and testified that in his opinion Jackson knew the difference between right and wrong at the time of the killing. Dr. Charles E. Newman testified for the prosecution, but was not permitted to testify from Dr. Cutts's notes. Dr. Cutts had, contrary to direction of the attorneys for defendants, given his notes taken during his examination of Jackson to Dr. Newman. Dr. Newman's testimony was confined to the answers to hypothetical questions. On the facts as related he stated: "I would feel very strongly that he knew right from wrong." Jackson, in his testimony, admitted the killing, and admitted the conversations related in his confession. He stated that, in discussing the killing, he had previously told Goodyear, "If it comes down to that (doing away with Powell), then I would cross the bridge when I got there."

In his testimony he said they did not have any particular plan up to and including the night of the killing.

There is only one common assignment of error. Both defendants moved for separate trials. Their motions were denied. Each assigns the denial of his motion for a separate trial as error.

Rule 254, Rules of Criminal Procedure for the Superior Courts of Arizona, 17 A.R.S. (1956), provides:

"When two or more defendants are jointly charged with any offense, whether felony or misdemeanor, they shall be tried jointly, unless the court in its discretion on the motion of the county attorney or any defendant orders separate trials. In ordering separate trials, the court may order that one or more defendants be each separately tried and the others jointly tried, or may order that several defendants be jointly tried in one trial and the others jointly tried in another trial or trials, or may order that each defendant be separately tried."

This court has stated that it is a discretionary function of the trial courts as to whether a motion for a separate trial should be granted. State v. Roberts, 85 Ariz. 252, 336 P.2d 151; State v. Smith, 60 Ariz. 305, 135 P.2d 879; State v. Sanchez, 59 Ariz. 426, 129 P.2d 923.

Other states have followed this rule. United States v. Andreadis, D.C., 238 F. Supp. 800; United States v. Miller, 4 Cir., 340 F.2d 421; People v. Brinn, 32 Ill.2d 232, 204 N.E.2d 724; People v. Perez, Cal. App., 42 Cal.Rptr. 161; People v. Alvarado, Cal.App., 42 Cal.Rptr. 310; People v. Krugman, 44 Misc.2d 48, 252 N.Y.S.2d 856.

In State v. Roberts, supra, we said:

"Finally, with respect to appellant's argument that it was error not to accord Roberts a separate trial because of Wyrick's prior conviction of felony, the granting of a separate trial is a discretionary function of trial courts requiring a fine attention to what is fair in each case and to the administration of justice generally. Rule 254 of the Rules of Criminal Procedure, 17 A.R.S. In the case at hand, we find no abuse of discretion in allowing the same jury to judge both defendants in light of the same evidence upon a single trial. See State v. Smith, 60 Ariz. 305, 135 P.2d 879, and United States v. Stracuzza, D.C.S.D.N.Y., 158 F.Supp. 522, 524." 85 Ariz. at 255, 336 P.2d at 152.

The question then under the rule as enunciated by this court is whether the trial court, in denying the motions of defendants for separate trials, abused its discretion. California has a similar code provision to that provided in Rule 254, A.R.S., which provides that when two or more defendants are jointly charged with a public offense, whether a felony or misdemeanor, "they must be treated jointly unless the court wants separate trials." In People v. Andrews, 165 Cal.App.2d 626, 332 P.2d 408, the court stated:

"* * * Appellants emphasize in their brief the injustice done appellant Shedd, as to whose guilt the evidence was unconvincing, but any abuse of discretion in the denial of a severance must be determined upon the basis of the showing when the motion was made and not what ultimately transpired. (Cases cited.)

\* \* \* \* \* \*

"'* * * It is not an abuse of discretion to refuse to grant a demand for separate trials because damaging testimony, admissible against one defendant and not against the other, may be received in the case, but it is then incumbent upon the court to limit such evidence in its application to the defendant to whom it is referable. People v. Erno, supra, 195 Cal. 272, 277, 232 P. 710; People v. Perry, 195 Cal. 623, 633, 234 P. 890; People v. Booth, 72 Cal. App. 160, 165, 236 P. 987.' We find no abuse of the trial court's discretion in the record before us." 165 Cal.App. 2d at 635, 332 P.2d at 413.

Both defendants make the argument that the court abused its discretion in deny-

ing the motions for separate trials because the confession of each defendant involved the other. This same contention was made in State v. Sanchez, supra, wherein this court, in passing upon this question, held:

"* * * The court in its general instructions further told the jury the confessions of Eredia were evidence against him alone, and not against Sanchez. The confessions, it is seen, were properly limited by the court's rulings and instructions. That no error was committed in these respects is, we think, clearly shown by the following authorities: State v. MacLaren, 115 Or. 505, 237 P. 969; State v. Kirkland, 175 N.C. 770, 94 S.E. 725; Lindsey v. State, 201 Ark. 87, 143 S.W.2d 573; United States v. Newhoff, 2 Cir., 83 F.2d 942; Brooks v. United States, 9 Cir., 8 F.2d 593." 59 Ariz. at 429, 129 P.2d at 924.

In the instant case the court instructed the jury that the confessions and statements made by Goodyear and Jackson were to be considered as evidence only against the defendant making the confession or statement. However, there is little difference in the confessions of Goodyear and Jackson except that Jackson went more into detail in regard to the conversations relating to their agreement that they "must get rid of Powell." An examination of the record shows that the court was careful in instructing the jury to limit the con-

sideration of evidence admissible against one defendant to that defendant alone.

Defendants contend that separate trials should have been granted for the reason that their defenses were antagonistic. The defense of the defendant Goodyear of "not guilty" is not inconsistent with that of defendant Jackson of "not guilty by reason of insanity." The fact that some antagonism developed between the attorneys during the trial does not show that the court should have granted separate trials. For the reason given, as stated in People v. Andrews, supra, the court had to pass upon the grounds for the motion as presented to it at the time the motion was made; however, as will appear in the disposal of other errors assigned in the case, what antagonism existed between the attorneys did not constitute prejudicial error.

We shall next consider the assignments of error by defendant Goodyear.

Defendant Goodyear contends that the court erred in requiring the defendants to exercise their peremptory challenges to the jury without consulting each other. A panel of forty-two jurors was called and sworn. The state was allowed ten peremptory challenges, and each defendant allowed ten peremptory challenges. The minutes of the record show that the county attorney objected to the court's denial of his request that the state be allowed twenty peremptory challenges and objected to defendants having ten challenges each. Also, the county

attorney requested that the court require defendants to exercise their peremptory challenges on separate sheets. The court denied the request of the county attorney that defendants be required to exercise their peremptory challenges on separate sheets, "and required the defendants to elect who should exercise their peremptory challenges." The record shows that this meant elect as to which defendant should exercise his challenge first. The jury list shows that each defendant exercised ten peremptory challenges, and the state exercised ten.

Rule 225 and Rule 226, Rules of Criminal Procedure, A.R.S., provide:

"Rule 225. Number of peremptory challenges

"The state and the defendant shall each be allowed the following number of peremptory challenges:

"1. Ten, if the offense charged is punishable by death or imprisonment for life.

"2. Six, if the offense charged is a felony not punishable by death or imprisonment for life.

"3. Three, if the offense charged is a misdemeanor.

"Rule 226. Number of peremptory challenges upon joint trial of several defendants

"A. If two or more defendants are jointly tried they shall collectively be allowed the number of peremptory challenges specified in Rule 225 only in case they join in such collective challenges, but in addition to such challenges each defendant shall be allowed the following number of peremptory challenges, which may be separately exercised:

"1. Two, if the offense charged is punishable by death or imprisonment for life.

"2. One, if the offense charged is not punishable by death or imprisonment for life.

"B. In the case provided in subsection A the state shall be allowed as many challenges as are allowed to all the defendants."

It will be noted that under Rule 226 when there are more than two defendants being jointly tried, they shall be collectively allowed the number of peremptory challenges allowed in Rule 225, but in addition to that number they are allowed—in a case punishable by death—two additional challenges which may be exercised separately. The court, in the instant case, as stated above, allowed each defendant ten peremptory challenges, which was the same number they would have been allowed if defendants had been tried separately.

In State v. Nemier, 106 Utah 307, 148 P.2d 327, the court said:

"The defendants were tried jointly. In choosing the jury, the court ruled that the defendants were entitled to ten peremptory challenges which must be exercised collectively, and each defendant was entitled to two additional challenges which he could exercise separately. To this the defendants excepted and contend that the court erred in not allowing each to exercise ten separate peremptory challenges. Section 105–31–2, U.C.A.1943, provides:

" 'If two or more defendants are jointly tried they shall collectively be allowed the number of peremptory challenges specified in section 105–31–15 only in case they join in such collective challenges, but in addition to such challenges each defendant shall be allowed the following number of peremptory challenges which may be separately exercised:

" '(a) Two, if the offense charged is punishable by death.'

"Section 105–31–15, U.C.A.1943, provides:

" 'The state and the defendant shall each be allowed the following number of peremptory challenges:

" '(a) Ten if the offense charged is punishable by death.'

"Defendants contend that section 105–31–2 applies only where no defendant objects to joining in the collective peremptory challenges, but if any defendant objects thereto such defendant is entitled to the full number of challenges specified in section 105–31–15, which he may exercise separately. This position is not tenable.

\*　　\*　　\*　　\*　　\*　　\*

" \* \* \* Their complaint is that the court refused to allow them ten separate challenges each but required them to make their ten challenges collectively. Where there are two or more defendants the statute does not provide for additional separate challenges if defendants refuse to join in the collective challenges. It provides for collective challenges which can only be exercised jointy. [sic.] The ruling of the court was therefore correct." 106 Utah at 310, 148 P.2d at 328.

It will be noted that the Utah law is similar to that of Rules 225 and 226, A.R.S. The trial court in the instant case should have—just at it did in the Utah case—allowed the ten challenges collectively, and then the extra two each to be exercised separately. The state would have been allowed, under Rule 226, an additional four peremptory challenges, making a total of fourteen for defendants—ten collectively and two each separately—and fourteen for the state. The state was allowed only ten challenges to the defendants' twenty. The only complaint made by Goodyear is that

they were required to exercise them separately. The jury list shows the peremptory challenges exercised by defendant Goodyear totaled ten, and the peremptory challenges exercised by defendant Jackson totaled ten, so, while defendants were not permitted to consult with each other in making their selection, or to exercise their challenges jointly, the effect was almost the same in that one of them knew what challenges the other had made before exercising his own. Therefore, they were not entirely separately made. Any disadvantage in not being permitted to confer was more than offset by the advantage of the number of peremptory challenges which each defendant was allowed, and the decrease in the number allowed the state.

In State v. Thompson, 68 Ariz. 386, 206 P.2d 1037, cited by defendant Goodyear, wherein three jurors who had been peremptorily challenged by defendant were, through error and mistake, left on the panel, and this in effect only gave the defendant seven peremptory challenges when he was entitled to ten, which, as we held, violated the defendant's substantial rights. As was stated in Thompson, supra:

"We are not unmindful that for many years this court has uniformly adhered to and enforced the rule that a conviction will not be set aside for mere technical errors or defects appearing in the record which do not affect the substantial rights of the accused. This substantial justice provision of the Constitution of Arizona (article 6, section 22) has been frequently invoked as to infractions of the formal rules of law relative to the selection and formation of juries, our decisions being to the effect that a defendant is not entitled to be tried by any particular jury, but merely by one 'which is fair and impartial. See Lawrence v. State, 29 Ariz. 247, 240 P. 863; Burnett v. State, 34 Ariz. 129, 268 P. 611; Kinsey v. State, 49 Ariz. 201, 65 P.2d 1141, 125 A.L.R. 3; Conner v. State, 54 Ariz. 68, 92 P.2d 524." 68 Ariz. at 390, 206 P.2d at 1040.

We hold that in the instant case the failure of the court to follow the procedure as outlined by the statute did not violate the substantial rights of defendants, and hence was not prejudicial error.

■ Defendant Goodyear assigns as error the introduction of photographs and other exhibits which he states are of a gruesome nature, and were introduced for the sole purpose of arousing the emotions of the jury and prejudicing defendant. The photos objected to number twenty-two in all. They show the body of the deceased from various angles as it was found lying just off the Flux Canyon Road. There are four photos showing the remains of deceased as they lay in the morgue. These four show where the bullets entered the body of the deceased. There are also photos

showing where the hands had been severed from the arms. Another was taken from the back showing the absence of the hands. Other pictures show the house where defendants were living.

In State v. Barker, 94 Ariz. 383, 385 P.2d 516, we said:

"Appellant urges that the lower court erred in admitting a morbid photograph of the head of the deceased, arguing that the photograph was repetitious in that the matters depicted could be ascertained from other exhibits in evidence. The photograph established the location of the mortal wound, how death was inflicted and assisted the jury in understanding the testimony of the witnesses. It highlights evidentiary matters which cannot otherwise be found. Under the repeated decisions of this Court, its admission into evidence was a matter for the trial court to decide in the exercise of its discretion. It was properly admitted in evidence. See State v. Robinson, 89 Ariz. 224, 360 P.2d 474 and Annot., 73 A.L.R.2d 769 'Admissibility of Photograph of Corpse' etc." 94 Ariz. at 386, 385 P.2d at 518.

Other cases hold that photographs are admissible for the purposes set forth in Barker, supra, and for the purpose of showing the wounds that caused the death and corroborating the state's theory of when and how the murder was committed. State v. Frye, 58 Ariz. 409, 120 P.2d 793; Burgunder v. State, 55 Ariz. 411, 103 P.2d 256; Young v. State, 38 Ariz. 298, 299 P. 682.

The trial court in its discretion found that the photographs had a probative value, and were admissible. We hold the trial court did not abuse its discretion in admitting these exhibits.

Defendant Goodyear next contends that he was prejudiced by the admission of the confession of Jackson in evidence. We discussed this under the first assignment of error. As pointed out there, the confession of one defendant is admissible if the jury is instructed, as was done in the instant case in regard to Jackson's confession—that such confession is to be admitted only against the defendant who gave it. State v. Sanchez and State v. Smith, supra.

Defendant Goodyear, under assignment of error five, contends that the court erred in permitting questions in regard to former convictions of the defendant Goodyear. In State v. Corrales, 95 Ariz. 401, 391 P.2d 563, we held:

"The general rule is that the state may ask the defendant, when he is a witness, whether he was previously convicted of a felony and the nature thereof. See State v. Sorrell, 85 Ariz. 173, 333 P.2d 1081 (1959); State v. Polan, 78 Ariz. 253, 278 P.2d 432 (1954); Hadley v. State, 25 Ariz. 23, 212 P. 458 (1923);

and West v. State, 24 Ariz. 237, 208 P. 412 (1922). The procedure followed by the trial court did not depart from the general rule. Appellant's assignment of error in this regard lacks merit." 95 Ariz. at 405, 391 P.2d at 566.

In the instant case this general rule was followed by the court. Goodyear was asked whether he had ever been convicted of a felony. His answer was yes, and then he was asked what was the name of the crime and he replied: "It was a morals offense." The question was then asked: "What was the nature of the crime? what was the name of the crime, * * *" He stated that there were two offenses, and both were in California—one in 1956 and one in 1959—and that the one in 1959 was the same as the one in 1956. Defendant answered the question as to the nature of the crime, and stated: "Oral copulation."

■■■ Defendant Goodyear contends that it was error to offer the exhibit discussed in the following testimony:

"[Prosecuting Attorney]: If the court please, we offer state's exhibit number 50 marked for identification and ask that it be admitted and marked in evidence.

"THE COURT: Does counsel have any objection?

"MR. HAYTHORNEWHITE: Yes, your honor, there is no sufficient foundation and it isn't a proper instrument, nor is it properly offered to this court.

"MR. HATHAWAY: We offer to the court that it is a certified copy that is required to be kept by the Clerk of the Superior Court in Tucson.

"THE COURT: I will sustain the objection of its not being a complete record. The objection is sustained."

As noted, the court denied the offer on the ground the exhibit was not complete. Defendant bases his contention on the ground of the holding in State v. Stago, 82 Ariz. 285, 312 P.2d 160; and State v. Singleton, 66 Ariz. 49, 182 P.2d 920, to the effect that a county attorney, in order to impeach a witness, cannot question a witness in regard to prior convictions unless he is prepared to impeach him. The facts in these cases are different from those in the instant case. The county attorney asked the questions in regard to prior convictions, and the defendant admitted two. He then attempted to introduce evidence in regard to a third which occurred in Pima County, Arizona. He asked no specific questions in regard to the crime. He merely offered the transcript in evidence. State's Exhibit No. 50 was a certified copy of the record of the Superior Court in Pima County, charging Ronald Joseph Goodyear of the crimes of lewd and lascivious acts in violation of A.R.S. § 13–652, which is a felony. The certified copy of the minutes show that the defendant was arraigned,

that an attorney was appointed to represent him, and that he entered a plea of guilty as charged, and the date for passing sentence set at Tuesday, July 20, 1959, at 9:15 a.m. The record is incomplete, in that it does not show the sentence. The sentence provided for under § 13-652 is imprisonment for not less than one nor more than five years. This exhibit meets the requirements, as set forth in State v. Corrales, supra, in that it shows defendant had entered his plea of guilty to a felony and the nature thereof. However, even if the exhibit were not admissible it was not prejudicial error to offer it in evidence because the jury at no time knew what was in the exhibit or to what it related.

 Defendant Goodyear under his assignment of error number seven contends that it was error to permit defendant Jackson to testify for the reason that he was incompetent. It would seem that this assignment was answered by the fact that defendant Jackson's defense in the case was that of insanity which was rejected by the jury and he was found guilty. However, the rule in regard to the competency of a witness is first a matter in the sound discretion of the court. Litzkuhn v. Clark, 85 Ariz. 355, 339 P.2d 389; State v. Hull, 60 Ariz. 124, 132 P.2d 436; Keefe v. State, 50 Ariz. 293, 72 P.2d 425; and Sheek v. State, 19 Ariz. 509, 172 P. 662. The testimony referred to by defendant Goodyear which he contends showed incompetency

was that of Dr. Cutts, who stated that defendant Jackson had uncontrolled tempers, rages, and an inability to stand stresses, and the use of poor judgment under stress. The court heard the testimony of Dr. Cutts, and had the opportunity of observing defendant Jackson, and evidently thought that he was competent to testify. The record does not show an objection by defendant Goodyear to Jackson's testimony at the time it was given, so, Goodyear not having raised the question of competency, the court certainly did not abuse its discretion in allowing Jackson to testify.

 Defendant Goodyear, under his assignment eight, contends the court erred in not granting a motion for mistrial on account of the conduct in the courtroom by Deputy Sheriff Allen, as follows:

"If the court please, I would like the record to show that Deputy Allen sitting in the front of the room is making loud and snickering noises, and I move for a mistrial, and he is one of the deputies, he is one of the deputies who was one of the—

"THE COURT: I am going to reprimand you for conduct that is wholly unbecoming of an officer of the law, and you are not to make an outward demonstration of any kind in this courtroom, Deputy Allen, and I am requesting you to remove yourself from the courtroom and I will again remind

you that I will not tolerate such conduct in this court, and I will place the defendants in the charge of Officer Willey and you may leave this courtroom at once, Officer Allen, and you are not to conduct yourself in that manner in this courtroom at anytime. (Officer Allen leaves the courtroom.) "THE COURT: Officer Willey will you please take charge of the defendants. Ladies of the jury, the court instructs you that the conduct of any person in this audience is not to be considered by you in any manner as bearing upon the guilt or innocence of these defendants. You are to decide the case on the evidence that you hear in the court and not by any outward demonstrations by anyone of the officers and it is highly improper for anyone to demonstrate as to how they regard the testimony of any witness, and I particularly wish to instruct you in that point, and you keep it in mind, and you are not to regard any comment the court has made to Mr. Allen."

It is the duty of the judge presiding over a trial to maintain order in the courtroom and to prevent and suppress any acts which might prejudice the rights of the defendant. In doing this he is vested with a large measure of discretion in determining what conduct is prejudicial to defendant. In State v. Peters, 44 Haw. 1, 352 P.2d 329, defendant contended the trial court erred in denying a motion for mistrial on the grounds of alleged misconduct on the part of a spectator. The daughter of the complaining witness admitted during recess that she had admonished her father to tell the truth, and admitted making motions to her father while he was on the stand to take his time. The father said that he did not see the motions. The court held:

"This court agrees with counsel for the defense that misconduct on the part of a spectator constitutes ground for a mistrial if the misconduct is of such character as to prejudice the defendant or influence the verdict. The trial court, however, has a large measure of discretion in determining whether the conduct of a spectator or bystander is of such a nature as to produce prejudice, requiring a declaration of mistrial. 53 Am.Jur., Trial, § 42. Upon careful examination of the proceedings in the instant case, this court finds no such prejudice or influence in either incident to warrant disturbing the trial court's denial of the motion for mistrial. Incidentally, it may be noted that the trial court suggested an instruction on the point from the defense but no such instruction was submitted." 44 Haw. at 5, 352 P.2d at 332.

In the instant case the trial court quickly corrected the situation, admonished the officer, and instructed the jury not to consider the conduct of any person in the audi-

ence in determining the guilt or innocence of defendants. Any possible error was cured by the instruction of the court. The trial court did not abuse its discretion in the denial of defendant's motion for mistrial upon this ground.

Defendant Goodyear assigns as error the denial of his motion for a new trial upon the grounds that one of the jurors was disqualified by reason of bias and prejudice, and her disqualifications were not known until after the trial. This was based upon the affidavits of three jurors similar in wording and to the effect that juror Maria B. Otero had made the statement that some two weeks before the trial she had determined the defendants were guilty, or words to that effect. There were three counter-affidavits of other jurors to the effect that they had sat with the juror Otero and that they had not heard her make any statement that she had a fixed opinion with regard to the guilt of either of the defendants prior to the trial. This court has held many times that great weight must be given the ruling of the trial court in the question of denying or granting motions for new trial because of alleged misconduct of a juror. In State v. Garaygordobil, 89 Ariz. 161, 359 P.2d 753, we said:

"The defendant next contends that the trial court abused its discretion in denying the defendant's motion for a new trial on the grounds of misconduct and prejudice of juror Powell. He alleges

that juror Powell, during the course of the trial: declared a prejudice against Mexicans; (2) talked and shook hands with several witnesses for the State; (3) questioned the defendant in court on irrelevant and immaterial details of defendant's testimony; (4) turned his back towards the witness stand during the testimony of nine character witnesses presented by the defense; and (5) told his cousin and the jury that he thought the defendant was guilty. The record reveals that the trial court went to great lengths in determining whether such accusations were true. The court held several conferences in chambers and heard testimony from both sides concerning juror Powell's right to continue as a juror. After a careful review of the record we hold that the trial court did not abuse its discretion in denying a new trial on those grounds.

We have stated many times that:

"'* * * great weight must be given to the ruling of the trial court on the question of granting or denying a motion for a new trial because of alleged misconduct of a juror. And the appellate court will not interfere with a matter so peculiarly within the knowledge of the trial judge unless an abuse of discretion exists * * *.' Whitson v. State, 65 Ariz. 395, 399, 181 P.2d 822, 824; State v. Jordan, 83 Ariz. 248, 255, 320 P.2d

. 446, 450." 89 Ariz. at 164, 359 P.2d at 755.

During the hearing on the motion for a new trial the juror Otero was sworn as a witness. The denial of the motion for a new trial was a finding by the court that the juror Otero had not made the statement. The court had before it the affidavits of all the jurors, and heard the testimony of Maria B. Otero. The court did not abuse its discretion in denying the motion for a new trial on this ground.

■ Defendant Goodyear next contends that this court should, under authority vested in it under A.R.S. § 13–1717, subsec. B, modify the sentence from death to life imprisonment. In the case of State v. Alford, 98 Ariz. 124, 402 P.2d 551, we stated:

"We can not pass upon whether capital punishment, as a public policy, is effective. We are limited to the judicial function of faithfully and impartially interpreting the law as enacted by the legislature. Under the doctrine of separation of powers the public policy of the state in fixing punishment for crime is declared by the legislature and not by this court. The legislature has provided life imprisonment or death as punishment for the crime of murder in the first degree. It is a trying task when a court is called upon to perform this duty when the defendant pleads guilty.

"The record shows that at the time of imposing sentence the trial court, in exercising its discretion, weighed and considered all the relevant matters, including material submitted by the defense, as well as the nature of the offense, the character of the defendant, the defendant's past conduct, past record and criminal activities and the defendant's moral character and associations, together with the fact that the defendant, in entering his plea of guilty, admitted all the elements constituting murder in the first degree. The record shows the commission of an atrocious crime and a total lack of any mitigating circumstances. We hold that in imposing the extreme penalty the trial court did not abuse its discretion under the circumstances of this case." 98 Ariz. at 132, 402 P.2d at 557.

In the Alford case sentence was imposed after a plea of guilty. The same rule should govern this court where the penalty is fixed by the jury as in a case where penalty is fixed by the trial court. The jury had the opportunity of observing the witnesses, and, after the considerations of all the evidence presented, fixed the penalty of death. Under the circumstances of this case we do not feel that we should change its verdict.

■ Defendant Jackson contends that the court expressed an opinion in a question to the jurors on voir dire on the facts

adverse to defendants. The proceedings complained of are as follows:

"Q. [to Mr. Paralis] You don't believe in the imposition of the death penalty?

"A. No, I don't.

"Q. Assuming that a member of your own family—we'll say—was the victim of a premeditated murder, I am not saying that that is the case in this instance, but for the purposes of illustration, and for determining your state of mind, would you feel the same that the death penalty would not be a proper penalty to invoke under such circumstances?

"A. Yes, it would.

"THE COURT: All right; you may step aside. Mrs. Anthony I'll ask you the same question. Assuming that a member of your immediate family, your husband or your sister or some one whom you love very deeply were the victim of a premeditated murder, and without alluding to this case but for the purposes of illustration, would you or is your state of mind—would your state of mind be the same?

"A. I believe so.

 * * * * * *

"Q. You feel that you could not impose the death penalty?

"A. No.

"Q. And if a member of your family, some one whom you love very deeply, should be a victim of a premeditated murder would you still feel the same way—

"A. (Inaudible)

"Q. Will you speak up audibily [sic.] so that I may hear you?

"A. Yes.

"Q. You may step aside. The clerk will call another name in lieu of Mrs. Ramirez."

Defendant Jackson cites as authority State v. Canipe, 240 N.C. 60, 81 S.E.2d 173 (1954). The facts of the Canipe case are different from those of the instant case. In that case the court asked the jurors whether they would have voted for the death penalty in the Greenlease kidnapping case, and the case where a German officer lined up fifty American boys facing the wall and shot them in the back in cold blood. Under these circumstances the court was of the opinion that in citing the particular cases the judge had inadvertently overstepped his self-appointed bounds and unintentionally expressed an opinion on the facts adverse to the prisoner. The court stated:

"This is true because the questions had a logical tendency to implant in the minds of the trial jurors the convictions that the presiding judge believed that the prisoner had killed his wife in an

atrocious manner, that the prisoner was guilty of murder in the first degree, and that the prisoner ought to suffer death for his crime." 81 S.E.2d at 178.

The trial court in the Canipe case had offered to release from service on the jury any trial jurors who might have been prejudiced against the prisoner because of his questions. The court held that the offer of the presiding judge was conditional and not absolute—that is, the jurors must make a confession in open court that their minds were prejudiced against the prisoner, and the second condition was, in substance, that they should make an accusation in open court that the presiding judge had instilled the prejudice in their minds. Under these circumstances, the court felt that the offer did not cure the error that had been made by the trial court. In the instant case, the court was merely asking questions to determine whether any of the jurors had conscientious scruples against the infliction of the death penalty. We are of the opinion that the question which referred to a juror's immediate family—"your husband or your sister or some one whom you love very deeply were the victim of a premeditated murder"—were not the most appropriate words, but, under the facts of the instant case, where the court stated "without alluding to this case but for the purposes of illustration, would you or is your state of mind—would your state of mind be the same?", we do not feel it was prejudicial error. While this explanation was not made in questioning one juror, all of the panel heard it. We have held in other cases that there was discretionary power in the court to determine the fairness and impartiality of the jurors and the right to determine whether the jurors had conscientious scruples against inflicting the death penalty. State v. Thomas, 78 Ariz. 52, 275 P.2d 408; and Young v. State, supra.

Next, defendant Jackson assigns as error the court's permitting counsel to inquire as to the impartiality of the jurors and their belief in the presumption of innocence by the following questions on voir dire to the jury:

"Q. Then you do realize that the defendants are presumed innocent until proven guilty?

"A. Yes.

"Q. And that the State has the—has to present evidence to over come those presumptions?

"A. That's right.

"Q. Supposing the Court submitted or would submit the case to you right now, would you presume these people to be innocent right now, and acquit them if you had the case?

"A. I don't think I could make up my mind right now, I don't know enough about it, really.

"Q. If you were required to vote right now would you vote for an acquital?

"THE COURT: That's speculative, Mr. Oglesby. I think it puts the prospective juror at a disadvantage.

"MR. OGLESBY: Pass the juror."
It will be noted that in the above proceedings in the examination of Mrs. Hall defense counsel passed the juror, and did not challenge her for cause. Defendant Jackson was questioning the juror in regard to the presumption of innocence. The juror answered the defendant: "I don't think I could make up my mind right now, I don't know enough about it, really." This was the answer of a juror who was willing to listen to the evidence before making up her mind. She had not been instructed fully by the court as to her duty in case the state did not put on any evidence. The answers of the juror do not show that she was not fair and impartial. We have held that a defendant cannot assign as error the answers of a juror which he does not challenge for cause. In Young v. State, supra, we said:

"* * * The purpose of the examination of jurors on their *voir dire* is to determine the real state of their minds, so that a jury may be chosen which will fairly and impartially try all the issues which arise between defendant and the state. People v. Redola, 300 Ill. 392, 133 N.E. 292. Such being the case, it is rarely, if ever, that the allowance of a question is reversible error, though the refusal to permit one to be asked may sometimes be. If either the state or the defendant believes that a juror is not fair and impartial a challenge must be interposed to him before any error can be predicated upon the fact that he sat in the case. Riley v. Davis [Southern Pacific Co. et al.], 57 Cal.App. 477, 207 P. 699; People v. Sanford, 43 Cal. 29; 35 C.J. 364." 38 Ariz. at 305, 299 P. at 685.

Defendant Jackson, under his third assignment of error, contends that it was error to strike certain portions of his confession. Only those which implicated Goodyear alone were stricken. The following are the portions stricken:

" * * * Ronnie mentioned—

* * * * * *

" * * * at least Ronnie was about ready to shoot him for a while, * * *

* * * * * *

" * * * and Ronnie says well, all right, you shoot him, * * *

"Q. This is Thursday night that you are referring to that Ronnie told you to shoot him?

"A. This is previous.

* * * * * *

"A. Well, we'll start off at Thursday night, Thursday night we were coming

back and Ronnie mentioned—well, he stated that Jackson will have to do something, he'll have to go tonight. Well, I. was leery. scared, and I didn't want to.

"Q. Let me ask you something again, where were you when Ronnie says he has to go tonight?

"A. As I remember the statement it was in the house of Mr. Powell outside the door.

 * * * * * *

"Q. You have stated awhile ago that Ronnie said he has got to go tonight,

 * * * * * *

"Q. Did Ronnie agree to use his J. C. Higgins .22 revolver?

"A. Yes, sir, if I needed it.

"Q. And did he help you load it or get it for you out of the bedroom?

"A. No, sir.

"Q. He knew you had it?

"A. Yes, sir.

"Q. And you had it with his consent?

"A. Evidently so.

 * * * * * *

"* * * Ronnie made the statement that he would have to go * * * do it, * * * and Ronnie said I am depending on you,

 * * * * * *

"* * * but Ronnie had."

The law is well settled in that where a confession is admitted against one defendant, and not against another co-defendant, and there are parts of it which are separable and can be left out, the portion pertaining to the co-defendant may be stricken. 20 Am.Jur., Evidence, Section 488; 31A C.J.S. Evidence § 375 and 2 A.L.R. 1017. The authorities cited by the defendant Jackson are to the effect that when a confession is admitted in evidence parts of the confession which are self-serving must also be admitted. In other words, you cannot just admit the part of the confession against the defendant and leave out that part which supports his theory of innocence. In the instant case the testimony stricken would not have in any way helped defendant Jackson in his defense of insanity.

 Defendant Jackson's fourth assignment of error is that the court abused its discretion in limiting his cross-examination of defendant Goodyear. The limitation which he complains of was as follows:

"Q. Then you began having numerous arguments with the decedent Powell, didn't you, Mr. Goodyear?

"MR. HAYTHORNEWHITE: Your honor, that has all been gone into, though, not by this counsel, it serves no purpose to through it again. [sic.]
"MR. OGLESBY: I am entitled to cross-examination as this is material to my defense.

"THE COURT: I think it has already been asked and answered, it is before the court and jury and you will serve no useful purpose in repeating the matter again.

\* \* \* \* \* \*

"MR. OGLESBY: May the record show that I requested the Court's permission to question the defendant Goodyear on the statement that he made to the Sheriff's office which has been introduced in evidence and marked as State's exhibit, and that I desire to question the defendant on certain matters appearing on page 22, beginning at line 9 and continuing through page 22 from line 9 through line 5 on page 23. And also may the record also show that the Court has refused me permission to go into that."

He cites as his authority the case of State v. Holden, 88 Ariz. 43, 352 P.2d 705. In the Holden case, Holden's accomplice had pleaded guilty and had turned state's evidence against Holden, and testified against him. There is no question but what, as stated in Holden, a defendant is allowed great latitude in the cross-examination of the co-defendant testifying against him. There is a distinction between the Holden case and the instant case in that the accomplice in the Holden case had entered his plea of guilty and turned state's evidence, and was testifying against defendant Holden. All of his testimony was directed against Holden and not in his own behalf, while in the instant case defendant Goodyear was testifying in his own behalf. The court restricted Jackson's examination solely for the reason that the questions he was asking had already been asked by the county attorney. A trial court has large discretionary power in the control of cross-examination, and in the instant case was merely exercising that discretion. 58 Am. Jur., Witnesses, Section 621; United States v. Hall, 4 Cir., 342 F.2d 849; Shupe v. State, 238 Md. 307, 208 A.2d 590; People v. Clay, Cal.App., 38 Cal.Rptr. 431; and Seiner v. State, Neb., 292 N.W. 112.

The questions which Jackson says he should have been permitted to ask defendant Goodyear related: (1) to the arguments with the decedent Powell; and (2) Goodyear's confession, beginning on page 22, line 9 thereof, and going through line 5 on page 23. That part of his confession relates to the discussion of Goodyear and Jackson about doing away with Powell. Goodyear admitted making the answers stated in his confession, and explained that those were his answers "at that time." Goodyear's testimony did not touch upon the sanity of Jackson. The court was of the opinion that all of the matters mentioned by Jackson's counsel had been thoroughly covered, and therefore exercised its discretion in sustaining the objection to this cross-examination by counsel for defendant Jackson.

The court did not abuse its discretion in restricting the cross-examination on the matters requested by defendant Jackson.

■■■ Defendant Jackson also assigns as prejudicial error the following statement of the county attorney, in his argument to the jury:

"If either of these defendants are not convicted and found by you to be guilty, they will walk from this courtroom as you ladies will walk from the court-room, and it will not be safe for people in this community. It is your responsibility, I know that you will consider it seriously."

This court has held attorneys are given wide latitude in their arguments to the jury. The arguments to the jury in the instant case were not reported, or at least they do not appear in the reporter's transcript. The statement complained of by the counsel for defendant Jackson appears in the back of the examination of the jurors on voir dire. We have no way of knowing whether the statement was objected to by defendant's counsel, or whether the counsel requested the court to instruct the jury to disregard it. It falls clearly within the statement by the county attorney in State v. Dowthard, 92 Ariz. 44, 373 P.2d 357—in which case at the close of the argument counsel for defendant approached the bench and requested the right to move for mistrial on the basis of the county attorney's "statement in his closing argument to the jury wherein, in substance, he stated that if the jury desired they would have the right to turn the defendant loose to go out and commit other burglaries or, on the other hand, they would have the right to find him guilty as charged in the information."

The court, in disposing of this assignment of error, stated:

"This Court has repeatedly held that attorneys are given wide latitude in their arguments to the jury. State v. Thomas, 78 Ariz. 52, 275 P.2d 408, affirmed 356 U.S. 390, 78 S.Ct. 885, 2 L.Ed.2d 863 (1954); State v. McLain, 74 Ariz. 132, 245 P.2d 278 (1952). Since there is no record of the actual argument, there is no way of placing the statement in its proper context, or of determining whether it was merely a reply to some statement made in the defense argument. Even so, we do not feel that the remark objected to was such error as to require a reversal of the case. In determining whether remarks made by counsel in criminal cases are so objectionable as to cause a reversal of the case, we have stated the best rule to be:

"'* * * Do the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circum-

stances of the particular case, probably influenced by these remarks.' Sullivan v. State, 47 Ariz. 224, 238, 55 P.2d 312, 317 (1936).

"There is nothing in the record to show that the remark so prejudiced the jury that it was the cause of the conviction of defendant. In addition, the jury was fully instructed that they were to predicate their verdict solely upon the facts as they found them from the evidence and the law as given to them by the court." 92 Ariz. at 47, 373 P.2d at 359.

As in the Dowthard case, supra, the court in the instant case fully instructed the jury to predicate their verdict solely upon the facts and the evidence, which instruction reads as follows:

"You should not be actuated by any spirit of revenge or any emotion of sympathy. You should decide this case on the evidence and the evidence alone, coolly, calmly and dispassionately, and without fear or favor. And when you have done that on the evidence and the law as I have given it to you, and that alone, your conscience should be clear, whatever your verdict may be."

This case was submitted on separate briefs of Goodyear and Jackson, and the replies thereto by the Attorney General. We have carefully examined the entire record in this case, as well as the assignments of error of both defendants. We find no prejudicial error.

Judgment and conviction of both defendants affirmed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and BERNSTEIN and UDALL, JJ., concurring.