406 P.2d 208

The STATE of Arizona, Appellee,
v.
Maurice E. HUNT and Ernestine W. Hunt,
Appellants.*

No. 2 CA–CR 5.

Court of Appeals of Arizona.

Oct. 5, 1965.

* This appeal was filed with the Arizona Supreme Court and assigned that Court's No. 1482. The matter was referred to this Court pursuant to § 12–120.23 A.R.S.

Darrell F. Smith, Atty. Gen., Robert W. Pickrell, former Atty. Gen., Phoenix, Norman E. Green, County Atty., Pima County, Jack Redhair, Deputy County Atty., Pima County, Tucson, for appellee.

Lesher, Scruggs, Rucker, Kimble & Lindamood, by Edward W. Scruggs and D. Thompson Slutes, Tucson, for appellants.

GORDON, Superior Court Judge.**

The defendants appeal from judgments of conviction entered in the Superior Court of Pima County, and from the order denying their motion for a new trial. Defendant Ernestine W. Hunt of Tucson, Arizona, was charged with one count of aggravated assault and battery upon the person of her five year old daughter, Ernestine (Tina) Hunt, and three misdemeanor counts involving abuse of said child, as follows: Contributory Delinquency and Dependency (A.R.S. §§ 13–821 and 13–822); Permitting the Life and Health of a Child to be Impaired by Neglect and Abuse (A.R.S. § 13–842); and Failure to Provide for Child (A.R.S. § 13–801), all allegedly having occurred on or about November 9, 1963.

Mrs. Hunt's husband, Dr. Maurice E. Hunt, was charged jointly in the same information with having committed the same four offenses. He was also charged in two additional counts with having been an accessory to two other felonious aggravated assaults and batteries in violation of A.R.S. §§ 13–141 and 13–143, one allegedly having occurred on or about October and November, 1961, and the second on or about April 10, 1962.

After several pretrial motions were denied, the defendants were tried jointly before a jury, and after six days of trial, the jury returned guilty verdicts against both defendants for the aggravated assault and battery count and all three child neglect counts.[1] Both defendants were adjudged guilty by the court on the aggravated assault and battery charge and all three of the child neglect charges, although sentence was imposed on only one of the neglect charges, to wit, contributory delinquency and dependency (Count IV of the information) and the aggravated assault and battery charge.

Prior to trial, there was a great deal of newspaper and television publicity given to the defendants' arrest, preliminary hearing, juvenile proceedings involving the child, investigations made by the County Attorney's office of the death of another of the Hunts' children, Ernest, and to other aspects of the case.

This appeal involves several major issues, as set forth in sixteen assignments of error. A summary of the evidence adduced at the trial is necessary for a proper understanding of the issues.

On November 9, 1963, Christina Hengsteler, an 18 year old University of Arizona co-ed, was doing housework for the defendants at their home. She had worked there on the three preceding Saturdays and was familiar with all five Hunt children, Tina, Stanley, Winston, Edith and Dwight. Miss Hengsteler came to work on November 9

** Note: The Honorable JOHN F. MOLLOY having requested that he be relieved, the Honorable FRANK X. GORDON, JR., Judge of the Superior Court, Mohave County, was called to sit in his stead and participate in the determination of this decision.

1. The two accessory counts against defendant Maurice Hunt were dismissed by the court at the close of the State's case upon defendant's motion for an instructed verdict.

at about 9 a. m. and started cleaning at one end of the house and worked toward the other end. She testified that she had not seen Tina all day. At about 4 p. m., while working in the vicinity of the furnace room, Miss Hengsteler heard a noise coming from behind the closed door of the furnace room. Thereupon she opened the door and observed Tina dressed in pajamas, lying on her stomach in the unlighted, dark furnace room, her head underneath the hot water heater, her hands tied behind her back with what later was described as a hair ribbon, her face bloody, and what appeared to be strap marks on her face. According to Miss Hengsteler, the child was whimpering, whereupon she picked her up and talked with her. Over objection, Miss Hengsteler testified that after she had asked Tina what had happened, Tina told her that her mother had hit her with a belt. Miss Hengsteler gave Tina a drink of water, told her to stay where she was, and giving the excuse of not feeling well to Mrs. Hunt, who was in the guest house cleaning, she left work, went home and talked with her mother who called the Sheriff's office. In response to the call, Ben Bernal, a deputy sheriff of Pima County assigned to juvenile work, went to Miss Hengsteler's house. She reported to him that she had found Tina in the furnace room with her hands tied behind her back; that she was bleeding and had blood on her face; that her nose was flattened like somebody hit her across the nose; that she was crying or whimpering; that when she found her, Tina's head was partially under the hot water heater; and that she was very much concerned for Tina's welfare.

Upon receipt of this information, detective Bernal, accompanied by Miss Hengsteler, drove to the Hunt residence. It is undisputed that he had neither a warrant for anyone's arrest nor a warrant to search any premises at this time.

After he arrived at the Hunt residence and parked his car, he noticed some people near a corral close to the residence. When he determined that they were Dr. and Mrs. Hunt, he approached them. Bernal testified that he identified himself to Dr. Hunt and stated that he would like to talk with him. Dr. Hunt refused, saying he was too busy, was leaving and couldn't speak with him.

Bernal said he then spoke to Mrs. Hunt, who was standing beside Dr. Hunt, and Dr. Hunt stepped aside. (It is not clear whether Dr. Hunt left the presence of the officer at this time.) In answer to his questions, Mrs. Hunt advised him that she had a daughter named Tina who was in the house and admitted that she was in the furnace room.

On officer Bernal's request to see Tina, Mrs. Hunt consented, and directed him to follow her into the house. When they reached the living room, Mrs. Hunt told Bernal to wait there and she would get Tina. Officer Bernal declined to wait and said that he would follow Mrs. Hunt, which he did.

When Mrs. Hunt opened the furnace room door in his presence, he observed that the room was small and dark. Mrs. Hunt turned on a light in the room, and Bernal saw Tina sitting on a suitcase with her hands tied behind her back with a red plaid ribbon. He testified that he noticed that she had bruises on her face and her nose was flattened. (Subsequent testimony for the defense was to the effect that Tina's nose always had a flattened appearance.)

Detective Bernal took Tina into the living room where he had a conversation with her in the presence of Mrs. Hunt. (Dr. Hunt came into the room later.) Bernal stated Tina "was very emotional" at this time. He asked her how she got all the bruises around her face and Tina stated that her mother had "beat her with a hose." This answer, according to Bernal, was modified by Tina when her mother asked her whether, in fact, the bruises hadn't happened in her play with her brother when he threw a rope around her and pulled up, playing as though she were a cow. To the mother's question, "Isn't that the way it was, Honey?" Tina answered, "Yes, Mommy."

Then Bernal, looking under Tina's pajama top, saw several diagonal, black and blue marks about an inch long across her back.

In response to his inquiry as to how Tina had been beaten so badly, Bernal testified Mrs. Hunt said she had "taken a belt to Tina" because she wouldn't mind.

On further examination of Tina, Bernal noticed her left arm was bruised and black and was swollen to about twice the size of her other arm.

At some time during Bernal's conversation with Mrs. Hunt, Dr. Hunt came into the room and Bernal questioned both parents about Tina. After using the Hunts' telephone, he advised them that he was taking Tina into his custody, which he did. The Hunts gave Bernal some of Tina's clothing and a bottle of medicine which Dr. Hunt advised Bernal was for Tina "since she had been having epileptic seizures, convulsions."

Tina was thereupon taken to the sheriff's office where photographs were taken, showing bruises and other discolorations on her face, back and arms. Later, Tina was given medical attention at a hospital.

It is to be noted that it was approximately thirty days later that the Hunts were arrested for aggravated assault, and Dr. Hunt was charged with being an accessory. The three counts of child neglect were added after the preliminary hearing.

## UNLAWFUL SEARCH AND SEIZURE

Defendants assign as error the trial court's denial of their pretrial motion to suppress the evidence compiled by detective Bernal during his visit to the Hunts' home November 9, 1963, including his observations regarding Tina's person and condition, Tina's statements to him as to how her bruises occurred, the statements made by Dr. and Mrs. Hunt, and the pictures taken of Tina later that day. The grounds set forth in the motion were that since detective Bernal did not have a search warrant or defendants' consent to the search, his search was unlawful and violated defendants' rights under the Fourth Amendment of the United States Constitution, prohibiting unreasonable searches and seizures in persons' homes.

Defendants also assign as error the lower court's overruling their objection to the admission of this evidence at the trial. It is claimed that all the evidence Bernal compiled as a result of his visit to the Hunts' home should have been excluded as the fruits of an illegal search and seizure.

The State argues that the evidence acquired does not fall within the confines of the protection of the Fourth Amendment and we agree.

The Fourth Amendment to the United States Constitution reads as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

A.R.S. § 13–1441 defines a search warrant as:

"* * * an order in writing issued in the name of the state of Arizona, signed by a magistrate, directed to a peace officer, *commanding him to search for personal property, and bring it before the magistrate.*" (Emphasis ours)

A.R.S. § 13–1442 sets forth the grounds for the issuance of a search warrant, and in each of its four subdivisions reference is made to "property," which by its character is personal property, as distinguished from real property, and is either stolen, embezzled, used to commit a felony, or in possession of a person who intends to use it as a means to commit a public offense, or is in other ways contraband.

A.R.S. §§ 13–1443 through 13–1445 fully describe the conditions precedent to the issuance of a search warrant—the type of examination of witnesses by the magistrate before its issuance, the method of issuance of the warrant and its form.

We concede that the exclusionary rule, if applicable, is broader than the ex-

clusion of items of personal property alone. It applies to oral evidence adduced from an officer's testimony as to what he saw or found pursuant to an illegal search. McGinnis v. United States, 1 Cir., 227 F.2d 598 (1955). However, we cannot agree with defendants' contention that officer Bernal's entry into their home and his conduct therein was unlawful, and therefore cannot agree that the evidence he obtained therein was illegally obtained and should be excluded. We arrive at this result by distinguishing Bernal's entry and investigation of the Hunts' home from those situations in which a search warrant or consent to the search of the premises is required.

A.R.S. § 8–221 sets forth a peace officer's authority regarding his disposition of a child in reference to the authority of the juvenile court, juvenile officer and probation officer of the county:

"A. A peace officer, other than the probation officer, who arrests a child under the age of eighteen years shall forthwith notify the probation officer, and shall make such disposition of the child as the probation officer directs.

"B. *This article shall not be construed to prohibit a peace officer from taking into custody a child* who is found violating a law or ordinance, who is reasonably believed to be a fugitive from his parents or from justice, or *whose surroundings are such as to endanger his health, morals or welfare unless immediate action is taken.*" (Emphasis ours)

■ This section clearly sets forth the situations in which a peace officer may take a child under eighteen into custody. In some of the situations the officer may be taking the child into custody under an arrest for the child's commission of a crime. In others, not. If his purpose is to remove the child from surroundings endangering its health, etc., he is neither arresting the child for a crime nor its parents nor anyone else who might have physical custody of the child at the time. Rather, he is acting as the agent or the extension of the Arizona

Juvenile Court as set forth in Title 8, Chapter 2 of the Arizona Revised Statutes for the protection of the child. This is not a criminal proceeding. The officer is not investigating the commission of a crime, or gathering evidence for the prosecution of a crime, but is exercising lawful authority to take the child into protective custody, subject to the future disposition of the child under the juvenile court's authority, should the same be invoked by petition.

■ We feel that officer Bernal, or any other peace officer contemplated by A.R.S. § 8–221, with reasonable cause to believe that a child's health, morals or welfare were being endangered therein, had not only the lawful *right,* but the lawful *duty* to enter the premises, investigate, and take the child into custody, if necessary, with or without a search warrant, and with or without consent of all of the persons having proprietary interests in the premises.

■ Although it is not controlling on our thinking, we recognize that a magistrate could not have issued a search warrant to have the effect desired in this case, even if Bernal had applied for one. Any idea that a child is the personal "property" of its parent is patently absurd. Further, the officer could not have complied with the warrant, had it issued. He is required by A.R.S. § 8–221, to dispose of the child in accordance with the wishes of the probation officer, rather than to bring it before a magistrate, as required in the form of the search warrant. A.R.S. & 13–1441.

Furthermore, a child isn't stolen property or property to be used in the commission of a felony or other public offense, so it couldn't be used as any other ground for the issuance of a search warrant under A.R.S. § 13–1442.

We agree with the reasoning of Judge Holtzoff in his dissent in the case of District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13, 13 A.L.R.2d 954 (D.D.C. 1949). He points out that the Fourth Amendment to the United States Constitution does not ban all searches, but rather prohibits only those that are unreasonable.

The Fourth Amendment originally was aimed at preventing the injustices of the general warrants and writs of assistance issued by the English and Colonial Governments for the purpose of making exploratory searches of homes with a view to discovery and seizure of incriminating books and papers and contraband property. We believe it was intended, and should be construed, to apply only to criminal prosecutions and proceedings of a quasi criminal nature for the enforcement of penalties.

Considering Bernal's obligations as a peace officer and the details of Miss Hengsteler's description of Tina's condition just related to him, he had a duty to proceed forthwith, without delaying to get anyone's permission (whether it be a magistrate's or the property owners') to extend the protecttive arm of the State of Arizona through its juvenile code to Tina without being concerned with what or who was responsible, or what subsequent criminal or civil proceedings might be instituted. To enter her home to protect Tina is certainly not a judicial or quasi-judicial proceeding but a matter of protective custody.

If officer Bernal had delayed his actions unreasonably under these circumstances, he would have been remiss in his duty. To require him to determine the existence and extent of each person's proprietary interest in the premises and obtain their consent before performance of his duty under A.R.S. § 8–221 would, in this case, have rendered the statute nugatory.

■ We hold that officer Bernal was on the premises lawfully in a noncriminal proceeding, regardless of the consent or nonconsent of Dr. or Mrs. Hunt. The remaining question is—Does this give him the authority to obtain from the premises evidence which would be admissible later in a criminal action against the parents of Tina? We believe it does. Being on the premises lawfully in performance of his lawful duty, the obtaining of the evidence was not illegal, hence not within the protection of the exclusionary principle of the Fourth Amendment to the United States Constitution, as there was no unlawful or unreasonable search or seizure. We do not have to consider the issue of the voluntariness of the statements or admissions made by the Hunts to Bernal at their home, as this was not raised below.

## ACCESSORY COUNTS

Counts Two and Three of the information each charged defendant Maurice E. Hunt with the crime of having been an accessory to the felony of aggravated assault and battery, in violation of A.R.S. §§ 13–141 and 13–143. Count Two was based on conduct in the months of October and November, 1961, and Count Three on conduct on April 10, 1962.

Prior to trial, defendants moved to quash Counts Two and Three of the information, and at the time of the argument on this motion, State's counsel and defendants' counsel stipulated that (1) Maurice Hunt had not been brought before a magistrate at any time at which he could have concealed from a magistrate any matters or things connected with Counts Two or Three of the information and (2) no person had been charged with, nor convicted of the acts of aggravated assault in connection with the acts, statements or conduct set forth in Counts Two and Three.

A.R.S. § 13–141 defines an accessory. By its provisions a person can become an accessory in either of two distinct and separate ways:

(1) He can knowingly conceal the fact of the commission of a felony from a magistrate after full knowledge of its commission, or

(2) He can harbor and protect the person charged with or convicted of the felony.

■ As the facts were stipulated, no one had been charged with or convicted of the felonious assaults referred to in Counts Two or Three, and Maurice Hunt had not been brought before a magistrate from whom he could conceal them, if he had known about them. The Court erred in denying the motion to quash upon the facts as stipulated.

At the trial, four witnesses, Dolores Hopson, Isabel Billings, Dr. Juan Fonseca and Dr. Milton Semoff were allowed to testify, over objection, concerning bruises Tina had on her body on other occasions—witnesses Hopson and Billings as to bruises she had in October, 1961, and witnesses Fonseca and Semoff as to bruises and scars she had in April, 1962.

■ This evidence was entirely immaterial as to the charges alleged to have occurred on November 9, 1963. The only theory on which it could have been admitted was in support of Counts Two and Three as against defendant Maurice Hunt.

At the close of the State's case, counsel for the defendants moved for a directed verdict in favor of Dr. Hunt on Counts Two and Three and the motion was granted. Defendants then moved for a mistrial on the basis of improper and prejudicial evidence being now before the jury, or in the alternative, in case the mistrial was denied, that the evidence be stricken. The court denied the motion for a mistrial, but granted the motion to strike. All of the testimony of Mrs. Hopson and Mrs. Billings and portions of the testimony of Dr. Fonseca and Dr. Semoff "referring to the years at the time they saw and examined this child in the years 1961 and 1962" were stricken from the record.

The jury was instructed thereafter as follows:

"Members of the Jury, in your absence the Court has granted a motion to dismiss or for a directed verdict as to Counts Two and Three of the information. Those are the two accessory counts, and are the two counts against the defendant Dr. Hunt only.

"The Court has granted the motion to strike, as a matter of law, or directed verdict, and this has nothing to do with the remaining four counts against both of the defendants, and it is no concern of yours and you are not to speculate or in any way consider the fact that the Court has granted the motion dismissing these two counts in your consideration of the remaining charges or your paying attention to the evidence that may come in yet and the evidence that has come in already with respect to those two counts.

"So, following through and the Court granting the motion for a directed verdict or to dismiss, it is the order of the Court that judgment be entered dismissing Counts Two and Three against the defendant, Maurice E. Hunt.

"Now, Members of the Jury, you will also remember that in support of those two counts, we had four witnesses, Dr. Fonseca, Dr. Semoff, and the two ladies from the school, Mrs. Hopson and Mrs. Billings. Now, the Court has granted a motion to strike all of the evidence of Mrs. Hopson and Mrs. Billings. That means that this evidence is stricken and is out of the record as though it had never been admitted or as though these two witnesses had never testified in the case. Now, their testimony related to alleged happenings, incidents in the year 1961. So, you are to consider the remaining counts and the remainder of this case as though that evidence had never been admitted and you are to completely disregard it and give it no consideration whatsoever.

"As to the evidence adduced from Dr. Fonseca and Dr. Semoff, both of them testifying concerning examinations and conversations and what not with Dr. Hunt during the years '61 and '62. Now, insofar as their testimony related facts, evidence or what they saw as a result of the examinations, and their opinions and conclusions, and what not, and conversations relating to things during those two years, that testimony on motion to strike has been granted and it is stricken and you are to disregard and not consider any fact or statement or—and the two exhibits that related to those two years have also been stricken, and you will not consider any of the evidence concerning any-

thing that happened during the years 1961 and '62.

"Now, any other evidence of either one of these doctors, relating to the case and happenings beginning November 9, 1963 is still in the case. So, bear in mind now that you are not to consider anything that has transpired in this case, or any statement or alleged fact or what not that may have been testified to or referred to that happened prior to November 9, 1963."

■ Our Supreme Court has recognized that although the granting or denial of a motion for mistrial is a matter for the sound discretion of the trial court, the trial court may be reversed for denying the motion for mistrial if it abused its discretion. State v. Kellington, 93 Ariz. 396, 381 P.2d 215 (1963); State v. Smith, 96 Ariz. 150, 393 P.2d 251 (1964).

■ We do not go so far as saying that once *any* improper evidence, regardless of how insignificant, is admitted, its effect cannot be cured by proper instruction and admonition. In the instant case it appears affirmatively in the record that prejudice occurred to defendants because of the admission of substantial and improper evidence in view of the dismissal of Counts Two and Three. It is highly questionable whether, after five days of trial and having heard nine witnesses, the jurors could completely expunge from their minds, as though it had never come before them, all of the testimony of two particular witnesses and portions of the testimony of two others. At this juncture of the case the Court should have granted a mistrial, and failure to do so was an abuse of discretion.

Therefore, it will be necessary to remand this case for a new trial as to both defendants. As several other issues have been raised on appeal that may arise again if the matter is retried, we will proceed to discuss the other major assignments of error.

## SEPARATE TRIALS

Defendants assign as error the lower court's denial of defendants' motion for separate trials. Rule 254, Rules of Criminal Procedure for the Superior Courts of Arizona, Vol. 17, A.R.S. (1956) provides in part:

"When two or more defendants are jointly charged with any offense, whether felony or misdemeanor, they shall be tried jointly, unless the court in its discretion on the motion of the county attorney or any defendant orders separate trials."

Defendants cite a New Mexico case, State v. Turnbow, 67 N.M. 241, 354 P.2d 533, 89 A.L.R.2d 461 (1960), in support of their position. In that case the Supreme Court of New Mexico reversed the convictions of a husband and wife on the grounds that it was an abuse of the trial court's discretion under a similar statute to deny their motion for separate trials, stating that it denied each the right to have the testimony of the other spouse excluded, forcing them to rely on the effect of instructions to overcome the prejudicial effect of the incriminating testimony of the spouse.

■ Since the filing of the briefs in this matter, our Supreme Court, in the very recent case of State v. Goodyear, 98 Ariz. 304, 404 P.2d 397 (filed July 1965) reiterated that the granting or denial of a motion for separate trials was discretionary with the trial court and its exercise of discretion would not be set aside unless abused. In that case our court cited with approval People v. Andrews, 165 Cal.App.2d 626, 332 P.2d 408 (1958), wherein the California court sets forth the principle that "any abuse of discretion in the denial of a severance must be determined upon the basis of the showing when the motion was made and not what ultimately transpired." Further, that court stated at page 414 of the citation:

"It is not an abuse of discretion to refuse to grant a demand for separate trials because damaging testimony, admissible against one defendant and not against the other, may be received in the case, but it is then incumbent upon the court to limit such evidence in its

application to the defendant to whom it is referable." (Citing cases)

■ In the Goodyear case, supra, as in the case at bar, the lower court did instruct, after every objection, that the statements made by one defendant were admissible only as to that defendant and not as to the other.

Defendants urged to the trial court, in support of their motion for separate trials, that their interests were antagonistic. The trial court heard argument prior to trial in support of the motion and denied the same. We believe our Supreme Court would not, under the Goodyear case, supra, and under the posture of this case, disturb the trial court's decision.

For these reasons, this assignment of error is deemed without merit.

## EXCITED UTTERANCES

Defendants also assign as error the lower court's permitting Christina Hengsteler and detective Ben Bernal to testify over hearsay objections concerning the conversations they had with Tina Hunt on November 9, 1963, when each of them first saw Tina in the furnace room.

Miss Hengsteler was allowed to testify that Tina told her that Tina's mother had hit her with a belt. Bernal testified that Tina told him that her mother had hit her with a hose.

■ These statements would obviously be hearsay unless they are admissible under the "excited utterance" or "spontaneous exclamation" exception to the hearsay rule. The requisites for an "excited utterance" are as follows:

1. There must be a startling event.

2. The words spoken must be spoken soon after the event so as not to give the person speaking the words a time to fabricate.

3. The words spoken must relate to the startling event. State v. McLain, 74 Ariz. 132, 245 P.2d 278 (1952).

Defendants contend that no foundation was laid for this exception, particularly the second element.

The length of time between the exciting event and the words spoken is crucial, and the opportunity for contrivance will depend upon the physical condition, age, sex, etc. of the declarant. In Soto v. Territory, 12 Ariz. 36, 94 P. 1104 (1908), the utterance of a young boy one and one half hours after the startling event was admitted.

In State v. Finley, 85 Ariz. 327, 338 P.2d 790 (1959), the statements of a woman held prisoner for several hours by an assailant who had sexually molested her was allowed to be related by a police officer to whom she complained within thirty minutes after her assailant released her. At that time she was excited, disheveled, weeping profusely, and had to be physically supported. It was stated in that case that the condition of the victim at the time of the utterance is a very important factor in determining whether the statement was within the res gestae. The court also said:

"It is clear from our previous pronouncements that: (1) it is impossible to formulate a definition of res gestae which will serve for all cases; (2) no rule may be formulated as to the limit of time within which the exciting cause should be held to have been dissipated so as to render such statement inadmissible; (3) a want of suitable opportunity, or fear, may sometimes excuse or justify a delay in making the disclosure; and (4), each case must depend upon its own facts and much *must be left to the sound discretion of the trial court.*" (Emphasis ours)

■ Applying these guidelines to the facts in this case, we believe the requisites and thus the foundation for the "excited utterance" exception were satisfied. Certainly the trial court was justified in finding that a startling event had occurred. The evidence disclosed that Tina's swollen and discolored left arm had recently been fractured and the cast had been removed only about a week before. The court could

have found from the evidence that Mrs. Hunt had beaten Tina with a belt several hours before the child was discovered, had tied her hands behind her back and that the child had been confined in the darkened furnace room and lay there in fear and pain with no one to complain to until Miss Hengsteler arrived, and then, while whimpering and bloody, related the details to her. Considering Tina's age, sex, emotional stability, fear, and other factors more apparent to him than to us, the trial court could have found, as in the Finley case, supra, that the initial assault and the subsequent restraint were two separate but related startling events, which blended into one continuous startling event that did not come to an end until she was finally released from her confinement.

If the court so found, the only remaining question would be whether sufficient time had expired thereafter in which Tina could have reflected and fabricated. It is not unreasonable to imagine that a child under such circumstances as are apparent from the evidence here could have been so excited or terror-stricken from her beating and confinement in the dark furnace room that both requisites were present and satisfied, even though several hours may have passed from the time of the beating. As to the third requisite, Tina's statements to Miss Hengsteler and detective Bernal both related to the beating which was the initial startling event.

The trial court ruled in favor of the testimony, and we must assume he considered these elements and resolved them in favor of its admissibilty. We will not substitute our judgment for his in this instance.

### PHYSICIAN-PATIENT PRIVILEGE

Over defendants' objection of physician-patient privilege, Dr. Charles Pullen and Dr. Everett Czerny, who treated Tina after she was taken into custody, were allowed to testify as to conversations which Dr. Hunt had with them wherein he stated that *"we* tied her (Tina's) hands and *we* placed her (Tina) in the furnace room." (Emphasis ours) It is urged by defendants that these conversations were for the purpose of giving the doctors a history of Tina and her injuries so that they could better understand her condition, and therefore are privileged and inadmissible.

A.R.S. § 13–1802, as amended, created the physician-patient privilege. The pertinent parts thereof state:

"A person shall not be examined as a witness in the following cases:

\* \* \* \* \* \*

"5. A physician or surgeon, without consent of his patient, as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

It is apparent from the statute that the privilege belongs to the patient and not to the physician, and must be claimed by the patient or someone authorized by law to do so on the patient's behalf.

Our Supreme Court has not had occasion to pass upon whether the parent of a minor child patient, may, solely because of his relationship as natural father or mother of the child, claim the privilege for the child.

The courts of other jurisdictions have stated that this privilege should be liberally construed and should not be limited to a strict construction of the phrase "necessary to enable him to prescribe or act for the patient." See In re Hunt's Will, 122 Wis. 460, 100 N.W. 874 (1904); Kling v. The City of Kansas, 27 Mo.App. 231 (1887); Feeney v. Long Island R. Co., 116 N.Y. 375, 22 N.E. 402, 5 L.R.A. 544 (1889); Edington v. Mutual Life Insurance Co., 67 N.Y. 185 (1876).

Also, in Van Heuverzwyn v. State, 206 Misc. 896, 134 N.Y.S.2d 922 (1954), it was held that a guardian ad litem for a minor had the power to waive the privilege. In Jones v. Jones, 208 Misc. 721, 144 N.Y.S.2d 820 (1955), the court held that the guardian ad litem of an infant was the proper person to claim the privilege.

The reason behind the physician-patient privilege is to encourage freedom of disclosure by the *patient* so as to aid

in the effective treatment of disease and injury. We do not believe its purpose is to exclude otherwise admissible evidence obtained from a third party whose interests in suppressing the evidence are patently adverse to the patient, merely because the declarant holds a close family relationship to the patient. We feel that the relationship of natural father or mother does not confer upon the holder of that title the right to claim the physician-patient exclusionary privilege if in doing so the claimant is excluding otherwise valid evidence of the parent having committed a crime against his or her child. Where such a conflict of interest exists, a guardian of the person or estate would seem to be the more appropriate holder of the privilege. No person with such legal authority appears in the record to have claimed or waived the privilege. Therefore, we feel the evidence was properly admitted.

As we have concluded that this evidence was admissible, defendant Maurice Hunt's motion for a directed verdict was properly denied. His statements to Drs. Pullen and Czerny would support an inference that Dr. Hunt participated in the acts of tying Tina's hands behind her back and putting her in the furnace room, regardless of what Dr. Hunt in his testimony stated he meant by these words.

## ELECTION BETWEEN MISDEMEANOR COUNTS

Counts Four, Five and Six of the information charged the defendants with violations of A.R.S. §§ 13–822, 13–842 and 13–801, respectively. These sections are as follows:

§ 13–822:

"A. A person who by any act, causes, encourages or contributes to the dependency or delinquency of a child, as defined by § 13–821, or who for any cause is responsible therefor is guilty of a misdemeanor * * *."

* * * * * *

"C. When the charge concerns the dependency of a child or children, the offense for convenience may be termed contributory dependency, and when the charge concerns the delinquency of a child or children, the offense for convenience may be termed contributory delinquency."

§ 13–842, as amended:

"A person having custody of a minor under sixteen years of age who wilfully causes or permits the life of such minor to be endangered, its health to be injured or its moral welfare to be imperiled, by neglect, abuse or immoral associations, is guilty of a misdemeanor."

§ 13–801:

"A. A parent who wilfully omits, without lawful excuse, to furnish necessary food, clothing, shelter or medical attention for his or her minor child is guilty of a misdemeanor * * *."

* * * * * *

The pertinent part of A.R.S. § 13–821 which could possibly apply to this case is as follows:

§ 13–821:

* * * * * *

"C. 'Delinquency' means any act which tends to debase or injure the morals, health or welfare of a child."

The trial court allowed all three of these charges to be submitted to the jury as against both defendants. The jury returned verdicts of guilty on all three as against both defendants. The court adjudged each defendant guilty of all three charges but sentenced each defendant on only one of the misdemeanors, to wit: Count Four, the Contributory Delinquency and Dependency charge.

Defendants, at the close of all the evidence in the case moved the court to require that the county attorney elect as to which one of these three misdemeanor charges he wished to have submitted to the jury as against each defendant and to have the other two dismissed. This request was denied. Defendants now complain that this was error, as all three of these statutes

charge the same crime, differing only as to who might be the perpetrator, a parent, a guardian, or a person with custody of the child.

They urge that all three of these crimes are duplications of each other, and could only have applied to the alleged neglect by the defendants to furnish Tina with food, medical attention and the like. They state that these charges were each based on the same evidence and transactions—that of the alleged beating and confinement on November 9, 1963, and the testimony of Drs. Pullen and Czerny to the effect that Tina should have been hospitalized on November 9, 1963. In view of this, defendants claim that the conduct cannot be split into two or more separate offenses.

Defendants do not complain of cumulative punishment, but of prejudice by allowing all three crimes to go to the jury—that it is more likely the jury will find the defendants guilty of one crime if three crimes are charged.

A.R.S. § 13–1641 reads as follows:

"An act or omission which is made punishable in different ways by different sections of the laws may be punished under either, but in no event under more than one. An acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

■ We agree with defendants' argument. The alleged beating of Tina was covered by the count in the information charging the defendants with an aggravated assault and battery. After dismissing the counts against Dr. Hunt as being an accessory to previous assaults and batteries against Tina, and striking all the evidence as to other previous bruised appearances of Tina, the evidence in the case taken in the light most favorable to sustain the conviction would appear to justify only one other charge, i. e., neglect of the child for failure to have provided her with proper medical care under the circumstances after the beating on November 9, 1963, and leaving her in the furnace room with her arms tied. Any one of the three misdemeanor counts, to wit: Count Four, alleging violation of A.R.S. §§ 13–821 and 13–822; Count Five, alleging violation of A.R.S. § 13–842; or Count Six, involving violation of A.R.S. § 13–801, would have sustained a conviction for failure to have furnished Tina with medical attention. Each of the separate charges refer to the same conduct charged to defendants and state the same crime in different ways. The court should have eliminated two of said counts before submitting them to the jury. We feel that defendants were prejudiced by the court's failure to do so. We do not pass on the question of whether this prejudice would have been dispelled if the court had instructed the jury that the defendants could only have been found guilty of one, and not more, of the three misdemeanor child neglect counts. This issue was not raised below.

■ We believe A.R.S. § 13–1641 which prohibits double punishment for one act allows the prosecutor to "carve as large an offense out of a single transaction as he can, but he must cut only one, and the State can carve but one conviction for the same offense." Fleming v. State, 168 Tex.Cr. R. 595, 330 S.W.2d 457 (1959).

In State v. Boodry, 96 Ariz. 259, 394 P.2d 196 (1964), defendant was convicted of both rape and incest as the result of one act of sexual intercourse with his five-year-old daughter. Our Supreme Court vacated the *sentence* imposed on the conviction for incest but allowed the conviction to stand. The court was careful to point out, however, that the prohibition against double punishment was not called to the attention of the trial court at any time. We believe this distinguishes the Boodry case from the case at bar.

### IMPROPER INSTRUCTION

Over the objection of defendants that the last two definitions were not supported by the evidence, the court read the entire State's Requested Instruction No. 6, which

defined an aggravated battery in three ways:

(1) an adult committing a battery upon a child;

(2) a battery wherein serious bodily injury is inflicted; and

(3) a battery committed with a premeditated design and by use of means calculated to inflict great bodily harm.

The gravamen of the battery charge herein was whether the parents of Tina had used an amount of punishment on Tina in excess of that allowed by the law under the circumstances. Corporal punishment of a child by its parent is not prohibited by law in this state but the use of immoderate or excessive physical violence against a child by a parent for correction or discipline purposes is an aggravated assault and battery.

One cannot expound an inflexible rule which would define what, under all conditions, would be reasonable or excessive force in the disciplining of a child. As children vary in degrees of sensitivity, responsibility and other qualities of character, as well as tolerance to pain, age, sex and physical condition, so must the degree of parental severity vary, especially when balanced against the gravity of the particular offense for which punishment is to be meted out. An error in parental judgment should not as a matter of law brand the act as unreasonable.

The test of unreasonableness is met at that point where the parent ceases to act in good faith and with parental affection, and acts immoderately, cruelly or mercilessly, with a malicious desire to inflict pain, rather than a genuine effort to correct the child by proper means. See State v. Mizner, 50 Iowa 145 (1878); Clasen v. Pruhs, 69 Neb. 278, 95 N.W. 640 (1903); State v. Spiegel, 39 Wyo. 309, 270 P. 1064, 64 A.L.R. 289 (1928). There was evidence in the case that might cause reasonable men to differ as to whether the defendants had used an immoderate or excessive degree of physical force in punishing Tina. Therefore the court was correct in giving the first definition.

Dr. Pullen testified that the injury to Tina's left arm (the swollen, discolored one) was severe. It is possible that this injury or fracture had been suffered some time before, particularly since it had been out of a cast for a week. Notwithstanding this, we believe it was the province of the jury and not the court, to determine whether this swollen and discolored member received its trauma by past accident or by a fracture received in her beating, or as a result of being tied up, or in her struggles to gain freedom from her bonds. Further, should this arm have been in a delicate balance of healing, the jury might well decide that tying her arms under such conditions would fill the third definition of aggravated battery. We feel the court was justified by the evidence in submitting all three definitions to the jury.

## TINA'S CONDITION ON NOVEMBER 2, 1963

Defendants contend the trial court also erred when it allowed Christina Hengsteler to testify as to Tina's condition on November 2, 1963, a week prior to the date of the alleged conduct of defendants. Defendants' motion to strike this testimony was denied. Although this testimony did include her mentioning some bruises Tina had at the time, it also was to the effect that Tina's elbow was not swollen on November 2, 1963. One inference would be that it became swollen some time later and possibly as a result of a beating or binding done on November 9, 1963. The testimony was admissible to show the condition of Tina's arm on a date in close proximity to the date in question, and the mere fact that it included some immaterial details of her condition at the time did not rob it of its admissibility.

## FAILURE TO DIRECT VERDICTS DUE TO INSUFFICIENCY OF EVIDENCE

 In view of our previous rulings on the admissibility of certain evidence, we feel that sufficient credible and competent evidence was presented to justify the court's denial of each of the defendants' motions for directed verdicts at the close of the State's case.

## FAILURE TO GRANT CHANGE OF VENUE

The defendants urge that the lower court erred in denying their pretrial motion for change of venue, made pursuant to Rule 201 of the Rules of Criminal Procedure. The defendants argued in support of the motion, in substance, that there had been such extensive and prejudicial publicity concerning the case in all its aspects, that they would be denied the opportunity of a fair and impartial trial. In support of their argument, the defendants attached nineteen newspaper articles purportedly published and distributed in Tucson, vividly detailing the circumstances of Bernal's and Miss Hengsteler's discovery of Tina, the juvenile hearing to determine her temporary custody, the county attorney's investigation into the entire Hunt family's background and the death of Tina's twin brother, Ernest, some twenty months before, the exhumation of Ernest's body for a proposed coroner's inquest into the circumstances of his death, and the preliminary hearing. Further, it was not disputed in this appeal that the county attorney's office handed out a typed press release for use in preparing a story concerning the arrest of the defendants and charges against them. It is also mentioned that pending the trial of the case the county attorney appeared on television several times discussing this case, child beating cases in general, and legislation against child beating.

 We agree with and are bound by the pronouncements of our Supreme Court that an order granting or denying a motion for change of venue lies wholly within the discretion of the trial court, State v. Robinson, 89 Ariz. 224, 360 P.2d 474 (1961), and that there is a legal presumption that at the time of trial defendants can be accorded a fair and impartial trial in the county in which the crime is alleged to have been committed, and that in order to overcome this presumption the petitioner must make it "affirmatively" appear that there is such a feeling of prejudice in the community as will be reasonably certain to prevent a fair and impartial trial. State v. McGee, 91 Ariz. 101, 370 P.2d 261 (1962).

 We feel, however, that the showing made in support of defendants' motion was insufficient to overcome the presumption of being able to obtain a fair and impartial trial. The record discloses that three veniremen were excused from the panel, but does not reflect the reasons therefor. Unless it is shown that some of this prejudicial publicity had affected the members of the jury panel to such an extent that it corroborated the defendants' charge of hostile atmosphere, we do not consider the publicity to have tainted defendants' trial.

In all probability the news media would not give such extensive coverage to a retrial of this case due to the time and interest lapse. Nevertheless, we hereby inform both press and bar alike that should the situation arise in the future, this court will stand ready to support a courageous bench which can and should unhesitatingly step in to prohibit pretrial publicity concerning pending cases which, by its quantity and quality, is prejudicial to the rights of the defendants, and which is calculated to inflame the public to such an extent that the fair and impartial administration of justice is impaired.

For the foregoing reasons it is ordered this cause be remanded for a new trial.

KRUCKER, C. J., and HATHAWAY, J., concur.