447 P.2d 896

**The STATE of Arizona, Appellee and Cross-Appellant,**

v.

**Maurice E. HUNT, Appellant and Cross-Appellee.**

**No. 2 CA–CR 113.**

Court of Appeals of Arizona.

Oct. 24, 1968.

Rehearing Denied Dec. 11, 1968.

Review Denied Jan. 21, 1969.

516

Gary K. Nelson, Atty. Gen., Carl Waag, Asst. Atty. Gen., Phoenix, for appellee and cross-appellant.

Mesch, Marquez & Rothschild, by Alfred C. Marquez, Tucson, for appellant and cross-appellee.

HATHAWAY, Chief Judge.

This appeal deals with problems arising out of the second trial of Maurice E. Hunt and Ernestine W. Hunt, husband and wife, who were tried to a jury on one count of aggravated assault and battery and one count of contributing to the delinquency and dependency of their five-year-old daughter, Tina Hunt. The acts were allegedly committed on or about November 9, 1963, and prior thereto.

An appeal was taken from the first trial, culminating in this court's decision, State v. Hunt, 2 Ariz.App. 6, 406 P.2d 208 (1965), reversing the convictions. On the second trial, Ernestine W. Hunt was found guilty of both counts. Maurice E. Hunt, hereafter called defendant, was acquitted of aggravated assault and battery but found guilty of contributing to the delinquency and dependency of a minor. He appeals from that conviction. The facts are substantially as set forth in our former opinion and we will not repeat

them, except insofar as necessary to the proper dealing with questions presented on this appeal.

## DID THE TRIAL COURT PROPERLY ALLOW EVIDENCE OF A CONVERSATION BETWEEN OFFICER BERNAL & DEFENDANT WHICH TRANSPIRED BEFORE DEFENDANT HAD BEEN ADVISED OF HIS CONSTITUTIONAL RIGHTS?

■ The defendant contends that use at trial of a conversation which he had with an investigating officer, Ben Bernal, when Bernal first arrived at the Hunt residence, was in violation of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), since Hunt had not been apprised of his constitutional rights prior to the conversation. If the proceedings had passed from the "investigatory" stage to the "accusatory" stage, prior to conversation, the defendant must have been effectively warned of his constitutional rights. In *Miranda,* the court "explained" the *Escobedo* rule in connection with "custodial interrogation." The court held that statements obtained in "custodial interrogation" could not later be used in a criminal trial, unless the "procedural safeguards" had been met. The court explained:

> "By custodial interrogation, we mean questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action* in any significant way." (Emphasis added)

■ Our Supreme Court has held that the "Miranda" rule may be violated by interrogation in one's own home. State v. Anderson, 102 Ariz. 295, 428 P.2d 672 (1967). There, the defendant had shot her husband in their home and then asked someone else to call the police. Our Supreme Court said:

> "In the instant case the defendant was interrogated in her home by a deputy

sheriff. It would be a misconstruction of the facts to contend that the defendant would have been free to leave, for she was the obvious suspect in an apparent murder which the sheriff's department was investigating. For this reason we must determine that it was imperative for the law enforcement officers involved to inform the defendant of her constitutional right to remain silent pursuant to the privilege against self-incrimination."

■ The questions before us therefore become: (1) Was Dr. Hunt "free to leave?" (2) Was he the "obvious suspect in an apparent" crime? We believe the facts compel an affirmative answer to (1) and a negative answer to (2). First, Detective Bernal testified that his reason for going to the Hunt residence was "to ascertain the circumstances" of a little girl in a furnace room with her hands tied. Unlike a shooting death, a prima facie crime is not established as the court assumed in the *Anderson* case. Indeed, the Hunts were not arrested until about a month after the events in question. Also, there is no reason to believe that the defendant would have been restrained, as the court assumed Mrs. Anderson would have been, had he desired to leave. The fact is that he did leave the room and return two or three times during the questioning and, as stated, was not arrested until a month later. We conclude that the facts before us do not bring this case within the holdings of *Anderson, Miranda* or *Escobedo.* As we said in State v. Tellez, 6 Ariz.App. 251, 256, 431 P.2d 691, 696 (1967):

> "* * * we believe that the point where the warning must be given is when * * * [the police have both reasonable grounds to believe that a crime has been committed and that the defendant is the one who committed it], for from that point forward the police can be expected to pursue the case against the defendant with vigor. The police must have focused generally upon the crime so that they would have cause for arrest without

a warrant. * * * The time for caution is when the arrest could be made. Everything prior to that time may reasonably be considered 'the general on the scene questioning' which is permissible under Miranda. * * *"

See also State v. Noriega, 6 Ariz.App. 428, 433 P.2d 281 (1967) where we held that the exclusionary rule of *Miranda* does not apply where the defendant was asked questions in a relaxed situation in his own home with his family present.

## DID THE TRIAL COURT ERR IN ALLOWING TESTIMONY RELATING TO INJURIES WHICH TINA HAD ON NOVEMBER 2, 1963, BECAUSE THE TESTIMONY WAS IMMATERIAL AND/OR IRRELEVANT?

Miss Hengsteler, the maid who discovered defendant's daughter's condition, testified concerning the nature of injuries which Tina had on November 9, 1963, compared to her condition on November 2, 1963. This testimony revealed that Tina had other injuries on November 2. Defendant contends that this evidence was prejudicial as to the assault and battery, charged to have been committed on November 9, because it constituted prior bad acts with which he was not charged.

■ Though this testimony may have been prejudicial to the defendant it was, nevertheless, relevant. The defendant was charged with (1) assault and battery, committed on November 9, 1963, and (2) contributing to the dependency or delinquency of Tina "on or about the 9th day of November, 1963, *and at various times prior thereto.*" (Emphasis added) Since the contributing to dependency or delinquency charge covers a period of time, the State was entitled to put on evidence of other acts which tended to establish that he had contributed to the dependency or delinquency of Tina.

■ We believe that if there was any prejudice in this regard that it was to the State rather than the defendant. The trial court was placed in a dilemma because evidence on Count 2 was often apparently prejudicial on Count 1. The trial court resolved the problem in favor of the defendant and consistently sustained objections to other testimony of Tina's injuries which had occurred prior to November 9. The defendant therefore cannot complain.

## DID THE TRIAL COURT ERR IN REFUSING TO GRANT A MISTRIAL AFTER ALLEGEDLY IMPROPER QUESTIONS WERE ASKED BY THE PROSECUTOR?

■ In the course of the State's examination of Dr. Pullen, concerning Tina's injuries, the prosecutor asked:

"Q Do you have an opinion whether this would be excess and unreasonable for disciplinary purposes?

\* \* \* \* \* \*

Q Do you have an opinion as to whether this child should be returned to the home or not in this condition?

\* \* \* \* \* \*

Q Well, do you have an opinion whether this is an unfit home?"

Objections to these questions were sustained before any answers could be given. The first and the third questions are improper, being ultimate questions for the jury, and did not call upon the witness' expertise. Since the questions remained unanswered, we agree with the trial court that there was no reason to grant a mistrial.

■ The defendant also complains of questions asked of him on cross-examination. The questions pertained to his treatment of Tina during the week prior to November 2, 1963. This evidence went to the second count, as we have previously noted, and properly should have been admitted.

■ A more serious problem is posed by a question asked on examination of Mrs. Davison, a juvenile probation officer. The prosecutor asked, "What is Tina Hunt's status at the present time, who are her parents?" The prosecutor

had been warned by the court against eliciting such testimony because it was irrelevant and highly prejudicial, since it tended to show that another court had already determined that the Hunt home was unfit.

The prosecutor defended his action on the ground that it was his belief that the fact that Mrs. Foote was serving as the foster mother of Tina was already a fact in evidence. The record reveals that he was correct in this belief, though apparently counsel for the defendant and the trial court disagreed wtih him. The following dialogue between the prosecutor and Dr. Thompson took place prior to the testimony of Mrs. Foote:

"Q And she comes to you, or is brought to you when she needs to see a doctor?

A Correct.

Q When her foster mother feels she needs to see a doctor, is that correct?

A Yes.

Q You know *her foster mother, Mrs. Foote?*

A Yes." (Emphasis added)

Had the jury been informed that the Hunts had been judicially deprived of custody of Tina, perhaps a new trial should have been granted. However, there is no showing that the reference to Tina's "foster mother" indicated more than that the Hunts had been *temporarily* deprived of her custody. See A.R.S. § 8–225, Custody of Child Pending Hearing. See also, A.R.S. § 8–510. The jury was already apprised of that fact when Lernal testified that he "took Tina into custody."

DID THE TRIAL COURT ERR IN ALLOWING TESTIMONY OF MRS. FOOTE THAT TINA HAD LIVED WITH HER SINCE DECEMBER, 1963?

▇ Mrs. Foote was called as a witness after the defendants had brought Tina before the jury with a scratch and a bruise on her face. The State offered Mrs.

Foote's testimony to counter the defense position that Tina fell often and bruised easily. Mrs. Foote testified that the scratch and bruise were not usual.

Mrs. Foote would not have been qualified to testify concerning these matters if it had not been shown that she had had ample opportunity to observe Tina's behavior and health. It was therefore necessary, for foundational purposes, to show that Tina had been living with her since December, 1963. As previously noted, we do not believe that this information created reversible error.

DID THE TRIAL COURT ERR IN REFUSING TO DIRECT A DEFENSE VERDICT BASED ON ABSENCE OF SUBSTANTIAL EVIDENCE TO SUPPORT A CONVICTION OF CONTRIBUTING TO THE DELINQUENCY OR DEPENDENCY OF A MINOR?

The defendant was convicted of "contributing to the delinquency and dependency of a child," A.R.S. § 13–822, as defined by A.R.S. § 13–821. A.R.S. § 13–822 provides, in part:

"A. A person who by any act, *causes, encourages or contributes* to the dependency or delinquency of a child, as defined by 13–821, *or who for any cause is responsible therefor* is guilty of a misdemeanor * * *." (Emphasis added)

The defendant was charged with contributing both to the *dependency and delinquency* of Tina Hunt. The definitions of these terms which are applicable to the facts of this case, as provided by A.R.S. § 13–821, are as follows:

"A. In this article, unless the context otherwise required:

"1. 'Dependent person' means a person under the age of eighteen years:

\*　　\*　　\*　　\*　　\*　　\*

"(g) Whose home, by reason of neglect, cruelty or depravity of his parents, or either of them * * * is an unfit place for such person.

\*　　\*　　\*　　\*　　\*　　\*

"C. 'Delinquency' means any act which tends to debase or injure the morals, health or welfare of a child."

■ As to the contributory delinquency count, under prior law it was necessary to prove that the child was in some way delinquent. Jackson v. State, 36 Ariz. 446, 286 P. 824 (1930); Durgelogh v. State, 37 Ariz. 258, 292 P. 1116 (1930). Allegations and/or proof of delinquency is not necessary under the present statute, however. Loveland v. State, 53 Ariz. 131, 86 P.2d 942 (1939); Brockmueller v. State, 86 Ariz. 82, 340 P.2d 992 (1959). No actual proof of injury to the child is necessary; the act of the defendant need only "tend" to "debase or injure the morals, health or welfare of a child." State v. Locks, 94 Ariz. 134, 382 P.2d 241 (1963); A.R.S. § 13–823.

Construction of A.R.S. §§ 13–821 and 13–822 is governed by A.R.S. § 13–827 which provides, in part:

"A. This article shall be liberally construed in favor of the state *for the protection of the child from neglect or omission of parental duty* toward the child, and also to protect children of the state from the effects of the improper conduct, acts or bad example of any person which may be calculated to cause, encourage, or contribute to, the dependency or delinquency of children, although such person is in no way related to the child." (Emphasis added)

In considering the record, most favorably to sustaining the conviction, we find:

1. Dr. Pullen testified that Dr. Hunt told him *"we* put her in the furnace room, *we* tied her hands * * *."* (Emphasis added)

2. Dr. Czerny testified that Dr. Hunt told him that Tina was "often" put in the furnace room, on recommendation of psychiatrists, "and that she seemed to like it in this darkened area."

Dr. Czerny also testified that Dr. Hunt told him:

"Furthermore, that because of the fact that there were hot water pipes and so forth in this room, that *they* felt it necessary to bind her hands occasionally to keep her from doing herself harm, burning herself and so forth." (Emphasis added)

He also testified that the anti-convulsant drug "mysoline" which Dr. Hunt had prescribed for Tina (implying that some restraint of the child might have been necessary for her own protection) was unnecessary and was discontinued.

Finally, Dr. Czerny testified that, during the period of his observation of Tina, she did not tend to seek withdrawal in dark places.

3. Detective Bernal testified that Dr. Hunt admitted that he had "hit Tina across the face," and defended that admission by saying, "She doesn't mind. You don't know Tina."

4. Mrs. Foote testified, in rebuttal to defense witnesses, that Tina did not bruise easily and healed normally when cut and bruised at the time of trial, that "she is not a difficult child," and that she actually "showed a fear" of closets rather than an affinity for dark places.

On the other hand, the defendant established the following:

1. He took no part in the November 9 beating itself and he was not aware of the plight of the child on that day until Detective Bernal arrived. (His use of the pronoun "we" in describing the events of that day to Drs. Pullen and Czerny was apparently due to the fact that it was a family problem, rather than any part he may have had in those events.)

2. The Hunts had sought medical and psychiatric care for Tina in the past.

3. The medical testimony indicates that the hospitalization of Tina on No-

vember 9, although ultimately determined to have been unnecessary, may have been due only to the beating on the 9th. Dr. Pullen testified that the injury to the left arm, which apparently was the main cause for hospitalization, was a recent injury in his opinion. There is no evidence of any source of that injury other than the beating on November 9. Both Miss Hengsteler and Dr. Hunt testified that the arm was not in that condition prior to November 9.

The liberal construction of A.R.S. §§ 13–821 and 13–822, required by A.R.S. § 13–827, "in favor of the state for the protection of the child from neglect or omission of parental duty" is in accord with the law in almost all other jurisdictions in this country. Cf. Bradley v. Commonwealth, 380 S.W.2d 211 (Ky.1964) (failure to pay, without defense of inability, child support under divorce decree constitutes contributory delinquency); State ex rel. Shoreline School District No. 412 v. Superior Court, 55 Wash.2d 177, 346 P.2d 999 (1959), cert. denied, 363 U.S. 814, 80 S.Ct. 1248, 4 L.Ed.2d 1154 (refusal, on religious grounds to send child to public schools, in violation of compulsory education statute, constitutes contributory delinquency); People v. Lowell, 77 Cal.App.2d 341, 342, 175 P.2d 846 (1946) (prosecution may introduce acts of defendant which may contribute to delinquency of child even though not specified in the information); People v. Deibert, 117 Cal.App.2d 410, 256 P.2d 355 (1953) (conviction for contributory delinquency affirmed where tavern owner acquiesced in sale of alcoholic beverages to minors in his establishment); People v. Voice, 68 Cal.App.2d 610, 157 P.2d 436 (1945) (making improper advances toward female child and using vulgar language in presence of); State v. Harris, 105 W.Va. 165, 141 S.E. 637 (1928) (keeping young girl out "as late as 11 o'clock" against will of her father); People v. Hemma, 94 Cal. App. 25, 270 P. 457 (1928) (note from 42-year-old defendant to 15-year-old girl asking her to meet him in secluded place at night "without apparently good reason"); People v. Pierson, 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187 (1903) (failure to provide medical attention, on religious grounds, for sick child); State v. Clark, 146 La. 421, 83 So. 696 (1920) (failure to provide for child, even though mother made no demand for support); Seleina v. Seleina, Dom.Rel.Ct., 93 N.Y.S.2d 42 (1949) (conviction of father for undermining discipline of home by telling daughter not to mind her mother); See also Cross v. People, 122 Colo. 469, 223 P.2d 202 (1950) and Cox v. State, 270 P.2d 373 (Okl.Cr.App. 1954).

■ Even though it is not seriously contended that Dr. Hunt actually took part in the beating of the child on November 9, the record still indicates that he consented to such treatment of his daughter. He defended his wife's action in beating the child, when Bernal was asking him about the child's injuries, by admitting that he had beat the child himself and implying that the child, in his opinion, deserved such a beating. He also told Dr. Czerny that Tina was "often" placed in the furnace room at the suggestion of psychiatrists—an extraordinary suggestion when one considers the danger from hot water pipes, a furnace and a water heater. We feel that the foregoing is sufficient to sustain the conviction under either A.R. S. § 13–821, subsec. A1(g) or A.R.S. § 13–821, subsec. C, supra, in that the defendant contributed to providing an unfit home which tended to injure the health or welfare of the child.

DID THE TRIAL COURT ERR IN NOT SETTING ASIDE THE CONVICTION ON COUNT 2 AFTER DR. HUNT HAD BEEN ACQUITTED ON COUNT 1 BECAUSE THE TWO VERDICTS WERE INCONSISTENT?

■ This contention is entirely without merit. The defense seems to imply that the only competent evidence which

would sustain a conviction for contributory delinquency or dependency is evidence of assault and battery. As we have noted, there was evidence that Dr. Hunt contributed to the cruelty of the home and that is enough for a conviction on Count 2 even though probably immaterial to Count 1. Cf. People v. Codina, 30 Cal.2d 356, 181 P.2d 881 (1947). See also People v. Lowell, supra.

▓▓▓▓ The State has prosecuted a cross-appeal in this case, alleging certain errors were committed by the trial court as to questions of law raised by the State during the trial. Though the State is authorized to appeal from "a ruling on a question of law adverse to the state when the defendant was convicted and appeals from the judgment,"[1] it is not authorized to appeal from a judgment of acquittal. United States v. Evans, 213 U.S. 297, 29 S.Ct. 507, 53 L.Ed. 803 (1909); State v. Miller, 14 Ariz. 440, 130 P. 891 (1913). Therefore, the questions raised in the State's cross-appeal can be directed only to the count upon which the defendant was convicted, that of contributory delinquency and dependency. Since we have affirmed the conviction on that count, there could be no prejudice to the State and the cross-appeal is dismissed.

Affirmed.

MOLLOY, and KRUCKER, JJ., concur.

## ORDER DIRECTING ENLARGEMENT OF OPINION AND DENYING MOTION FOR REHEARING.

PER CURIAM.

The defendant has moved for a rehearing, stating, inter alia, that our opinion, filed October 24, 1968, failed to dispose of certain matters raised in the briefs. We deny the motion and direct that our opinion be supplemented as follows: On page 2, *following* the first full paragraph and *be-* *fore* the block heading "DID THE TRIAL COURT PROPERLY ALLOW EVIDENCE," etc., insert the following:

## DID THE TRIAL COURT ERR IN REFUSING TO GRANT DEFENDANT'S MOTION FOR SEPARATE TRIALS?

The defendant alleges that it was error to try him and his wife during the same trial because it deprived them of the anti-marital fact privilege, A.R.S. § 12–2232, citing State v. Turnbow, 67 N.M. 241, 354 P.2d 533, 89 A.L.R.2d 461 (1960). This same question was raised on the first appeal in this case and was decided adversely to the defendant. It would ordinarily become the law of the case. We have noted, however, that the case upon which we relied in deciding this question in our former opinion, State v. Goodyear, 98 Ariz. 304, 404 P.2d 397 (1965), has recently been indirectly overruled by the United States Supreme Court. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). (*Bruton* is made applicable to the states by Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (June 10, 1968) ).

▓▓▓▓ An examination of both *Bruton* and *Turnbow* reveal, however, that those decisions are based upon a showing of prejudice to the defendant. We find no such prejudice in this case. A thorough examination of the record has convinced us that no otherwise privileged communication between the husband-wife defendants in this case was introduced. The privilege only extends to communications and does not apply to acts. Posner v. New York Life Ins. Co., 56 Ariz. 202, 106 P.2d 488 (1940). We again find this contention to be without merit.

At page 7, *following* the first full paragraph and *before* block heading "DID THE TRIAL COURT ERR IN ALLOWING TESTIMONY," etc., add:

▓▓▓▓ The defendant also contends that the following statement by the prose-

1. A.R.S. § 13–1712, subsec. 4.

cutor, in summation to the jury, constituted reversible error:

"I have tried to bring evidence before you, all of the evidence I could. *There are certain things that we can't get in * * *.*" (Emphasis supplied)

The statement infers that the defendant was guilty of misconduct toward his child in other ways or instances in addition to those described at trial. We again agree with the defendant that such conduct is improper and we do not condone it. We agree with People v. Perez, 58 Cal.2d 229, 23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946 (1962), as to a prosecutor's duty toward assurance of a fair trial. It is our duty, however, to determine whether or not a fair trial was had, not whether it was perfect.

State v. Haffa, 246 Iowa 1275, 71 N.W.2d 35 (1955).

While it is true that argument before the jury as to evidence which has been excluded by the court, or withdrawn after objection, or simply not in evidence, may constitute reversible error, Canova v. State, 151 Tex.Cr.R. 252, 207 S.W.2d 404 (1947); Stapleton v. State, 107 Tex.Cr.R. 596, 298 S.W. 578 (1927); People v Perez, supra, we do not feel that the vague statement made by the prosecution in this case was sufficiently prejudicial to warrant reversal. The defendant cites no authority, and we are unable to find any, in which a similar statement has been held to be reversible error. See State v. Cutlip, 131 W.Va. 141, 46 S.E.2d 454 (1948); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).